**SOUTHWESTERN LIFE INSURANCE COMPANY,**
Plaintiff-Appellee-Cross-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellant-Cross-Appellee.

No. 75–2675.

United States Court of Appeals,
Fifth Circuit.

Oct. 5, 1977.

Rehearing Denied Dec. 2, 1977.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., Scott P. Crampton, Asst. Atty. Gen., Gary R. Allen, Atty., Gilbert E. Andrews, Acting Chief, Appellate Sec., Bennet N. Hollander, Richard Farber, Tax Div., U. S. Dept. of Justice, Washington, D. C., Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., for defendant-appellant-cross-appellee.

O. Jan Tyler, Robert K. Sands, Dallas, Tex., for plaintiff-appellee-cross-appellant.

Before TUTTLE, GOLDBERG and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal presents for consideration the correctness of the trial court's judgment in a suit for refund filed by the insurance company by which judgment the trial court resolved several of the contested issues in favor of the taxpayer and the remaining issues in favor of the Commissioner. Since the parties are not content to leave the split solution where it stands, it is necessary for us to give separate consideration to each of the many points at issue in the trial court. We shall first discuss the five issues which the trial court resolved in favor of the taxpayer, and which the Government has raised on its direct appeal to this Court. We then turn to the issues resolved in favor of the Commissioner and brought before us here by cross-appeal by the insurance company. Fortunately, both for the Court and for those affected by the opinion of this Court, counsel for the appellees followed the pattern of the Government's brief in discussing the several issues and, with an effort to get quickly to the merits of the controversy, counsel for the appellees followed almost verbatim the wording of the Government's brief in positing the issues which, on the Government's direct appeal, we state as follows:

## I. ISSUES ON DIRECT APPEAL

1. Whether the district court erred in holding that it had jurisdiction to consider the merits of taxpayer's argument concerning its claimed deduction under Section 809(d)(5) of the Internal Revenue Code of 1954 for the increase in its reserves for nonparticipating contracts.

2. Assuming *arguendo* that the court was correct in determining that it had jurisdiction, whether Section 809(d)(5) which provides an additional 10-percent deduction for increases in life insurance reserves attributable to nonparticipating contracts, is subject to the Section 810 "spread rule" to the extent that the increase is due to reserve strengthening.

3. Whether the district court erred in holding that mortgage escrow funds,

taxes and other amounts withheld from taxpayer's employees and various other amounts received or retained by taxpayer during the years in issue did not constitute "assets" of the taxpayer within the meaning of Section 805(b) of the Code.

4. Whether the district court also erred in holding that due and unpaid accident and health premiums were not includible in taxpayer's assets.

5. Whether the district court erred in holding that amounts paid by taxpayer to pension plans as "excess interest" on certain life insurance and annuity contracts constituted "amounts in the nature of interest" within the meaning of Section 805(e)(2) of the Code.

## II. NATURE OF THE CASE

The issues in this case arise under the Life Insurance Company Income Tax Act of 1959, 26 U.S.C. § 801 through 820. Congress has long recognized the difficulties in accurately establishing life insurance company annual income and, as reflected in the legislative history, S.Rep.No. 291, 86th Cong., 1st Sess., p. 5 (1959–2 Cum.Bull. 770–775) an apparent tax advantage is allowed to such companies on account of the nature of their long-term contracts which make it possible that what might appear to be income in the current year could conceivably be required later to fulfill insurance contracts. It is not deemed necessary for our consideration of the several issues involved to outline the precise method by which taxable income of life insurance companies is measured. It can be assumed, of course, from the fact that the issues are raised that their resolution will affect the ultimate income tax liability of the taxpayer.

## III. ISSUES NUMBERS 1 AND 2—RESERVE STRENGTHENING UNDER SECTION 809(d)(5)

These issues are treated together, because it is the Government's position that the Commissioner's disallowance of the ten percent deduction for increases in life insurance reserves attributable to nonparticipating contracts under Section 809(d)(5) was not challenged by the taxpayer by a claim for refund before the filing of the suit now before the Court. If we find this contention to be correct, we do not reach the merits of the question.

The "ground" for the taxpayer's contention that it is entitled to a refund as to this item arises from the unique provisions of the Code dealing with the treatment of certain reserves which is not brought about by normal additions to reserves. The Code authorizes the deduction in the tax year by an insurance company of the total amount normally added to reserves. In a case of "reserve strengthening" that is, when the company elects to increase its reserves beyond those required by § 808 of the Act, the Code requires that the deduction of the amount, here $820,068, be made over a period of 10 years, beginning the following year. This is called the "spread" rule. The statute further authorizes the deduction of an additional 10% of the amount of any reserve increase attributable to nonparticipating contracts. The taxpayer claims, and the trial court held, that this 10% could all be deducted for the tax year because it was not covered by the "spread" rule. The government contends, to the contrary, that the statute requires the same treatment of this additional 10% as is given to the principal amount itself: None is deducted in the tax year but deductions must be spread over the succeeding 10 years. Resolution of this issue depends upon the construction of § 809(d)(2), 809(d)(5) and 810(d) of the Code.

Section 7422 of the Internal Revenue Act of 1957 provides as follows:

*"No Suit prior to filing claim for refund*—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secre-

tary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof." 26 U.S.C. § 7422(a)

The Supreme Court has long since held that a failure to raise factual and legal grounds in a claim for refund bars a recovery on such a claim in a subsequently filed suit for refund, *United States v. Felt & Tarrant Manufacturing Co.,* 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931); *Angelus Milling Co. v. Commissioner of Internal Revenue,* 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945). This Court has stated in *Alabama By-Products Corp. v. Patterson,* 258 F.2d 892, 900 (1958):

"All grounds upon which a taxpayer relies must be stated in the original claim for refund so as to apprise the Commissioner of what to look into. The Commissioner can take the claim at its face value and examine only those points to which attention is necessarily directed. . . Anything not raised at that time cannot be raised later in a suit for refund. . . . ."

In this case it is clear that the taxpayer has in no way raised the reserve strengthening issue as to the *extra* ten percent in the claim for refund which it filed for the year 1958. The only basis upon which the taxpayer could contend to the contrary is in a document denominated "Rider No. 8" to the 1958 claim. For the better understanding of the holding on this issue we duplicate this rider herewith:

"Schedule E–2, Part III
Deduction for Nonparticipating Contracts

|  | End of Year | Beginning of Year | Increase or Decrease |
|---|---|---|---|
| Per R.A.R. | $221,143,632 | $209,949,877 | $11,193,755 |
| Claim adjustments (a) Reserve strengthening at 12–31–58 which was considered as being made at 12–31–54 | (820,068) | (820,068) | ----- |
| (b) Reserves of policies which became participating during the year |  | (2,949,993) | (2,949,993) |
| Per Claim For Refund | $220,323,564 | $206,179,816 | $14,143,748" |

The taxpayer contended that item listed (b) "reserves of policies which became participating during the year," had been treated erroneously, and should be changed by increasing the deduction for nonparticipating contracts by the sum of $2,949,993. In the tabulation shown above, it listed the item of $820,068 under this general heading for the computation of the deduction for nonparticipating contracts but it made no claim thereabout. It plainly indicated that the taxpayer made no contest with respect to disallowance of the bracketed amount, since it showed the amount both at the end of the year and the beginning of the year. There is nothing on this schedule or any other part of the claim or any document submitted to the trial court by which the taxpayer raised the contention which it now seeks to raise in the suit for refund that the Commissioner had improperly disallowed the item of 10% of $820,068 during the tax year 1958. The trial court's response to the Government's challenge to its jurisdiction to

consider this claim was "the Government has been well advised of taxpayer's claim on this issue, through both the claim for refund and conferences with its agents. Accordingly, the issue is properly before this Court and this Court has jurisdiction over the subject matter." The Commissioner contends that there is no basis for that part of the trial court's statement that the Government was well advised "through . . . conferences with its agents." Appellees only response to this is that:

"In Rider 8, the adjustment was listed as erroneously have been determined by the agent as occurring in 1957 rather than 1958. There is also no question but that on the examination of taxpayer's claim for refund the examining agent changed his position and recognized the reserve increase as occurring in 1958 but reduced the amount of increase in reserve on which the Section 809(d)(5) deduction was based by the amount of $820,068. All of these facts are clearly disclosed by taxpayer's 1958 income tax return, its claim for refund, Rider 8, and by the fact that the examining agent changed his position that the reserve increase occurred in 1958, not 1957. He could not have made the change without knowing that taxpayer was making a claim with respect to this issue in its claim for refund which was different from that asserted by the Government. Thus, the district court's fact finding is not clearly erroneous."

This statement is faulty in several respects. In the first place, in Rider 8, the adjustment was not listed as erroneously having been determined by the agent as occurring in 1957 rather than 1958. It was simply listed as having been "considered as being made at 12–31–57." The fact that on examination of taxpayer's claim for refund the examining agent changed his position and recognized the increase as occurring in 1958 does not indicate that anything was done or said with respect to taxpayer's contention that 10% or $820,068 could be deducted during the tax year rather than over a ten year period following the tax year in question. Nothing stated by defendants in-

dicates that the taxpayer met the requirements of the statute, as interpreted by the courts, that a written claim calling specific attention to the alleged error and the basis on which the claim was being made was ever communicated to the Commissioner.

We must conclude, therefore, that the trial court did not have jurisdiction to consider the Section 809(d)(5) claim on the merits. This, then, disposes of issues numbered 1 and 2, *supra*.

## IV. ISSUE NUMBER 3—MORTGAGE ESCROW FUNDS AND OTHER AMOUNTS HELD IN CASH BY TAXPAYER FOR EMPLOYEES AS "ASSETS"

■ (a) Mortgage Escrow Funds. For simplification, we adopt the formula as stated in the government's brief to give an indication of the importance of ascertaining whether certain items carried on the taxpayer's books as assets are "assets" as defined in § 805(b)(4) and as used to compute taxpayer's tax liability under the act. There is an exclusion for the policyholder's share of the investment income as a step in the computation of the tax. In highly simplified form, the excluded portion of a company's investment income is computed as follows:

$$\frac{\text{Investment Yield}}{\text{Assets}} = \text{Earnings Rate}$$

$$\text{Earnings Rate} \times \text{Reserves (adjusted)} + \text{interest paid} = \text{exclusion}$$

It is clear that the higher the amount of the company's assets in this formula, the lower is its earnings rate and thus the higher would be its taxable share of investment income.

The mortgage escrow funds, represented by bank deposits in the general bank accounts of the taxpayer, are claimed by the company not to fall within the definition of assets for the purpose of this computation. The trial court accepted this view of the matter and concluded that *Liberty National Life Insurance Company v. United States,* 463 F.2d 1027 (5th Cir. 1972) required this result.

During the years in question, the taxpayer held substantial amounts of mortgages on real estate, some having been made directly between the taxpayer and the borrower and others having been made through mortgage loan correspondents or servicing agents who serviced the loans pursuant to written contracts entered into with taxpayer. Under the standard contracts employed by the taxpayer, the mortgagor was required to make monthly payments which consisted of a reduction of principal, interest, and a sum sufficient when added to subsequent monthly payments to enable the taxpayer to pay the year's property taxes and insurance when these items should come due. The items other than principal and interest are called by both parties "mortgage escrow funds." These funds were deposited in the general checking accounts of the taxpayer. During the tax years, the cash of the taxpayers, which included the escrow items, was deposited in approximately 1500 different banks, which held annually reported balances varying from a few hundred dollars to approximately one million dollars.

The amount of "mortgage escrows" was substantial, amounting on December 31, 1958 to $333,036.18 and increasing thereafter to $674,608.89 in 1965.

In addition, correspondents or servicing agents had on deposit in their general bank accounts much more substantial amounts of cash in 1963, 1964, and 1965 all subject to the control of the taxpayer. The amounts of these escrows for the tax years follows:

Mortgage Escrow Funds Held by Taxpayer:

| 1958 | 1959 | 1960 | 1961 | 1962 | 1963 | 1964 | 1965 |
|---|---|---|---|---|---|---|---|
| 333,036.18 | 363,965.29 | 342,321.75 | 577,562.96 | 643,952.09 | 586,194.95 | 621,415.61 | 674,608.89 |

Service Company Escrow Funds Held by Taxpayer:

| 1958 | 1959 | 1960 | 1961 | 1962 | 1963 | 1964 | 1965 |
|---|---|---|---|---|---|---|---|
| – | – | – | – | – | 1,176,551.10 | 1,040,980.22 | 1,105,624.05 |

All of these amounts were included as assets on the Annual Statement of the taxpayer.

Section 805(b)(4) contains a definition of the term "assets" for purposes of determining an insurance company's earnings rate:

"For purposes of this part, the term 'assets' means all assets of the company (including non-admitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business."

This Court has held in *Liberty National Life Insurance Co., supra,* that monies held by life insurance companies *in trust* belong to someone else and are not assets of the insurance company. Furthermore, the Court determined that as to the escrow funds there before the Court the company "serves as trustee." The Court did not refer to the actual language of the mortgage instruments to show the basis for its determination that "the monies received are held for the use of the mortgagors. Liberty cannot lawfully disburse these funds for any purpose other than in satisfaction of the trust arrangements." 463 F.2d at 1029.

The difficulty here is that we do not know what was stated in the mortgage documents referred to in the *Liberty National* case to cause the court to hold that the monthly payments of the escrow amounts created a trust for the mortgagor with the insurance company as trustee; nor, in this case, do we know the terms of the agreements between mortgagors and insurance company. The company, as plaintiff in this refund suit, did not deem it necessary to prove the terms under which these payments were made to the taxpayer. Thus, proof is lacking on whether the agreement created a trust of the kind alluded to in *Liberty* or merely created the relation of debtor and creditor. There is no evidence in this record of a single document that creates an express trust, although both parties treated the matter as we know it

actually occurred, that is, that each dollar deposited in the mortgage escrow account represented a payment made by a mortgagor against the company's later payment of certain items that were payable once a year.

Moreover, the government's brief states that the taxpayer has conceded in a trial brief that none of the mortgage documents created an express trust. This statement is not challenged by any of the subsequent briefs filed by the taxpayer. Since it is clear that the money was paid under a written agreement and since the company does not undertake to claim that it has breached any trust relationship by which it got possession of these funds or mishandled them after receiving them, we fail to see how a constructive trust could be impressed on the funds as against the company. *See, e. g., Blankenship v. Citizens National Bank of Lubbock*, 449 S.W.2d 77, 79 (Tex.Civ.App. 1965); *Nichols v. Acers Co.*, 415 S.W.2d 683 (Tex.Civ.App.1967). So far as the record discloses the company had every right to consider that its receipt of these funds from the various mortgagors created merely an obligation to pay the taxes and insurance when they became due, a contractual obligation and nothing more.

Not only did the taxpayer fail to prove that these funds actually belonged to others than the mortgagee by producing an agreement to that effect but also the company's treatment of the funds was clearly inconsistent with its present contention that they were trust funds. It is clear that taxpayer did not deal with these funds in the manner required of trustees by the Texas statutes, Article 7425b, § 10, p. 228. In *Langford v. Shamburger*, 392 F.2d 939 (5th Cir. 1968), this Court construed this statute and we there held that it forbids a trustee from comingling trust funds with its own, citing and construing the Texas case, *Langford v. Shamburger*, 417 S.W.2d 438 (Tex.Civ.App. —Ft. Worth, 1967, *writ ref'd n. r. e.*) which in turn cites Bogert on Trusts as follows:

"The trustee may violate the duty of loyalty by lending trust funds to himself. He thus brings into play a conflict of private and representative interests. As lender it is his duty to get the best terms possible as to interest, security, and maturity. As debtor his impulse is naturally in the direction of getting the money at the lowest rate and often on other terms not advantageous to the lender. If he lends to himself, he cannot give an impartial judgment as to the adequacy of the security offered.

. . . . .

If there is no formal loan but a trustee mingles the trust funds with his own and uses them in his private business, the transaction can be treated as a breach of trust on either of two theories, namely, that of conversion of the trust property, or disloyalty. Bogert Trusts and Trustees, 2d Ed. § 543(J), p. 548."
417 S.W.2d at 444.

This Court then said:

". . . Under section 10 of the Texas Trust Act, the section quoted with approval from Bogert, and the language in *Wichita Royalty Company*, supra [*Wichita Royalty Co. v. City Nat. Bank*, 127 Tex. 158, 89 S.W.2d 394], it is improper for trustees to comingle trust funds with personal funds and to retain large sums of trust money in personal bank accounts even after trust bank accounts have been opened. To say nothing of the cases and commentary, both practices fly in the face of the Act's provision against loans of trust funds by a non-corporate trustee to himself. (Footnote omitted)."

Furthermore, in *Langford*, this Court held that Texas law mandated a holding that the borrowing of trust funds (which includes depositing such funds in the personal account of the borrower) constitutes illegal self-dealing "because the trustee inevitably benefits, and, just as inevitably, the beneficiaries suffer." *Id.* at 944.

In *Liberty*, even though the Court determined that the funds there were trust funds, we pointed out that if such funds were used for the benefit of the insurance company, we would consider them to be assets within the meaning of § 805(b)(4). We said:

"Unless it could be shown that the escrow funds actually were used for investment or that they had indirectly served to permit Liberty to invest more assets than it ordinarily could, we cannot see how it can be said that the escrow funds were assets of the company. In our view the only type of benefit which Liberty might receive from the escrow funds, which in turn would result in our holding that the funds were assets within the meaning of § 805(b)(4) would be the freeing up of other assets for investment. Because we find no evidence indicating that such benefit inured to Liberty, we hold the district court's contrary finding to be clearly erroneous."

463 F.2d at 1031.

This Court had previously held in *Langford, supra,* that under Texas law, which controls here, the legal consequences of the relationship between mortgagor and mortgagee here—such comingling of funds—confer a benefit on the comingler. In that case we said:

"In developing this idea, we will assume the cash balances in the trustees' accounts never fell below the amounts owing from their accounts to the trusts. (Footnote omitted). We note first that it is both a decided advantage and an unusual occurrence for a person to have large sums of money from outside sources in his bank account for a period of years on an interest-free basis. As part of the same picture, we observe that those from whom these funds are withheld are the losers because their money is earning no interest. Even though the borrower never spends the money but rather lets it stand idle so that he can always pay whatever he owes, certain benefits nevertheless accrue to him: With a larger account, he can borrow money from the bank at lower interest rates, reduce the service charges on his account, and perhaps even become a director of the bank. In short, the borrowed funds serve as a cushion for his account. While the borrower has this cushion, the one from whom the money is borrowed has no opportunity to let his money either appreci-

ate by investment or earn interest in a savings account. With the advantages inherent on one side and disadvantages on the other, it would be unthinkable for courts to say that a trustee, on whom the highest duty of loyalty is imposed, can be the borrower and his trust the lender."

*Id.* at 944.

Of course, we do not hold that if the taxpayer should violate the Texas statute with regard to the handling of trust funds it necessarily follows that such funds are not indeed trust funds. We point to this handling of the matter by the taxpayer only to indicate that on this record which is otherwise silent as to the existence of a trust, the company's conduct was inconsistent with its present contention that these funds "belong to someone else."

Not only was the handling of these funds by the taxpayer inconsistent with its claim that they were trust funds but a further distinction appears from the fact situation which was discussed by the court in *Liberty.* That is, that there is proof in this record that the general funds of the company, including the mortgage escrow amounts, were scattered over some 1500 different banks, apparently in every hamlet, town and village in a large area of the southwest. It would seem that this use of the escrow funds must have been for some business purpose which would, of course, be a benefit to the taxpayer which the *Liberty* court found lacking.

■ Essentially, we have a simple issue: Were these funds assets of the insurance company or did they belong to someone else? The presumption of correctness that follows the deficiency notice places the burden on the taxpayer of establishing all matters necessary to show that it does not owe the taxes in question. *Helvering v. Taylor,* 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; *Gibbs v. Tomlinson,* 362 F.2d 394 (5th Cir. 1966).

We conclude that not only did the taxpayer not carry this burden by proof that the money carried in these bank accounts were not assets but the proof, such as it

was, is to the contrary. The trial court erred in holding that these funds were not assets of the company within the contemplation of the statute.

(b) Amounts Withheld from Taxpayer's Employees and Miscellaneous Other Funds Held by Taxpayer. These items, which together would add something over one million dollars to the assets reportable for 1962 and in excess of two hundred thousand dollars in the years 1963, 1964 and 1965, included an item denominated "liability for cash held in escrow—Roberts," "withholding taxes—federal, state, and city," "mortgage participation—Sun Ray," "amounts deducted from employees' pay to be used for various items" and "miscellaneous." The government contends that these items should all be treated in the same manner as are the mortgage escrow funds. The taxpayer says with respect to these items. "These same principles [the principles applicable to treatment of 'mortgage escrow funds'] and arguments apply with respect to amounts withheld from taxpayer's employees and miscellaneous other funds held by taxpayer as agent or trustee. *See* § 7501 and *Arcnell [Artnell] v. Commissioner,* 18 [48] Tax Ct. 411 (1967)."

■ Reference to § 7501 makes it plain that so far as the amounts included any federal internal revenue tax, these amounts were held by the company in trust for the benefit of the United States. Title 26 U.S.C. § 7501 provides:

> "(a) General rule—Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose."

The government says that this section does not mean what it says and that it does not create a true trust. It takes the position that it is only when the amounts become due and become unpaid that a true trust relationship is created. Although the taxpayer does not undertake to respond to this argument, we are not impressed with the idea that once the government requires the collection by an employer of part of the taxes owed by his employee, by deducting the amount from the employees' compensation and states that such amounts "shall be held to be a special fund in trust for the United States" it doesn't mean precisely what it says. So far as these amounts are concerned, they are not part of the taxpayer's assets.

■ In view of the fact that the taxpayer agrees that the same considerations that apply to the mortgage escrow funds shall be applied to these other items, and does not undertake to distinguish between them, we treat them in that manner, except for the withheld federal internal revenue taxes. The trial court therefore erred in excluding such items from the company's assets for the tax years in question.

## V. ISSUE NUMBER 4: "DUE" AND "UNPAID" ACCIDENT AND HEALTH PREMIUMS AS "ASSETS."

During the tax years in question, taxpayer sold both cancellable and non-cancellable accident and health insurance policies in addition to its life insurance business. The policies typically provide for a grace period of 31 days during which the policy remains in force notwithstanding the failure of the insured to pay the premium on the due date. As of the end of each of the years in issue, taxpayer had a substantial number of policies in force by virtue of the grace period provision. The premiums which would ultimately be paid on these if they were kept in force are referred to by the taxpayer on its books and statements as "due and unpaid."

Even though taxpayer had no legal claim or entitlement to these amounts if the policyholders should elect not to renew them, experience had dictated that a very substantial number were actually paid and the taxpayer included them in "admitted assets" in its annual statement for the years in question. Due and unpaid accident and health premiums are also included in tax-

payer's "gross premiums" in the summary of operations section of its annual statements and in its gross premiums for federal income tax purposes. However, for the purpose of computing its assets under § 805(b) of the Code, taxpayer did not include any portion of the due and unpaid premiums.

Although the trial court held in the government's favor as to a seemingly similar item of "due and unpaid" life insurance premiums, which judgment has since submission of this case been partially approved by the Supreme Court's decision in *Commissioner of Internal Revenue v. Standard Life & Accident Ins. Co.* (No. 75–1771) —— U.S. ——, 97 S.Ct. 2523, 53 L.Ed.2d 653, dec. June 23, 1977, the court concluded that due and unpaid accident and health premiums did not constitute assets based on its finding that:

> "No life insurance reserves are maintained or established as a result of the due and uncollected premiums on accident and health policies, therefore, they differ from deferred and uncollected premiums on life insurance contracts."

It is true that in the formula used in determining life insurance company taxes, the term "reserves" in the equation refers to "life insurance reserves." The government concedes that there is no proof on this record that Southwestern Life Insurance Company set aside as a part of its life insurance reserves any amount representing the ordinary accident and health policies. The taxpayer, however, concedes that such amounts were set aside for some non-cancellable health and accident insurance contracts.

■ While the taxpayer contends that the amount set aside for such "few" policies are entitled to a different treatment, the trial court did not make this determination. It found that no such reserves were set aside even for non-cancellable policies. This is evidently wrong. The thrust of the Court's opinion in *Standard Life, supra,* is

that if the taxpayer benefitted taxwise from setting aside the amount as reserves, then it must be treated uniformly when its inclusion favors the tax gatherer. This issue must be remanded to the trial court to determine whether, and to what extent, the setting aside of reserves for these policies benefitted taxpayer in the several computations, and then to require a corresponding inclusion of this amount as assets under § 805(d).

## VI. ISSUE NO. 5: "AMOUNTS IN THE NATURE OF INTEREST"—§ 805(e)(2).

In addition to the selling of life insurance, Southwestern is in the business of administering qualified pension and profit sharing plans. It maintains life insurance reserves with respect to the contracts setting up these plans. Under state law, the maximum interest rate taxpayer can use in computing these reserves is 3½%. In order to be competitive with banks and other financial institutions that administer pension plans, taxpayer enters into an agreement with the plans that purchase its contracts in which it agrees to pay these plans an annual amount in excess of the 3½% interest used in computing the reserves. The taxpayer is enabled to do this because it actually earned on its investments of the reserves substantially in excess of 3½%. This excess, of course, does not become a part of the reserves; nevertheless, in an equation utilized by the statute to determine the exclusion from investment earnings of that part of investment income deemed to be the policyholder's share, the statute treats all income derived from reserves uniformly. That is to say, the statute provides for an equation to determine the exclusion from the taxable investment income which gives the same effect in the ultimate determination of tax liability to that part of the income which is added to the reserve and to that part which is in excess of the statutory rate. That equation is expressed as follows:

$$\frac{\text{"policy and other contract liability requirements}}{\text{total investment yield}} \times \frac{\text{each item of investment}}{\text{yield}}$$

= exclusion for policyholders' share."

It will be apparent that an increase in the numerator of this fraction would increase the exclusion for the policyholders' share and thus decrease the taxable portion of investment income.

The numerator "policy and other contract liability requirements" is equal to the sum of three items (§ 805(a)):

1) the adjusted life insurance reserves, multiplied by the adjusted reserves rate,

2) the mean of the pension plan reserves at the beginning and end of the taxable year, multiplied by the current earnings rate, and

3) the interest paid.

Thus far, there appears to be no ambiguity. But § 805(e)(2) provides that "the interest paid for any taxable year" includes:

". . . (2) *Amounts in the nature of interest.*—All amounts in the nature of interest, whether or not guaranteed, for the taxable year on insurance or annuity contracts (including contracts supplementary thereto) which do not involve, at the time of accrual, life, health, or accident contingencies."

It is only under this provision that the taxpayer claims that the payments of the "excess interest" are deductible as "interest paid" as one of the three elements constituting the numerator of the above fraction.

The commissioner contends that a proper interpretation of this section under normal rules of grammar would preclude the use of these payments to increase the amount of "interest paid" and furthermore that any different construction would, in effect, give a double benefit to the taxpayer because the excess earnings on its reserves, as we have already pointed out, have already been included in the numerator of the fraction because *all* of the company's earnings on reserves, including the excess over the 3½% rate, have been included in the term "the adjusted life insurance reserves."

The taxpayer does not deny that its construction of § 805(e)(2) provides some increased benefits to the extent that it is permitted to deduct as interest amounts which it has never reported as income. However, it contends that Congress intended to achieve this result in order to equalize insurance companies engaged in this business with non-insurance company competitors. The record does not indicate to what extent the special tax provisions for insurance companies places them in a competitive position with others. We can't simply construe one provision of the definition of interest as one part of a complex formula for determining taxable income for an insurance company by comparing it with some particular part of an ordinary income tax statute affecting non-insurance company taxpayers. Taxpayer also contends that a proper construction of § 805(e)(2) would yield the result for which it contends.

The construction argument revolves around the question whether the words "which do not involve, at the time of accrual, life, health, or accident contingencies" modify the word "amounts" or the word "contracts." The taxpayer contends that the section should be construed to read as follows: "All amounts in the nature of interest . . . for the taxable year . . . which do not involve, at the time of accrual, life, health or accident contingencies."

The government concedes that if this is the proper construction, then these amounts do become allowable as interest. However, it contends that the section should be construed to read as follows: "All amounts in the nature of interest . . . for the taxable year on insurance or annuity contracts . . . which do not involve, at the time of accrual [of the amount], life, health, or accident contingencies." Citing Strunk & White, *The Elements of Style,* 1962 ed., pp. 22–24, the government says it is a basic rule of English grammar that modifiers in a sentence should be placed, whenever possible, next to the word they are intended to modify. Under this rule, of

course, the words "which do not involve, at the time of accrual, life, health or accident contingencies" would modify the word "contracts" and would not modify the word "amounts." It is clear that if the phrase modifies "contracts" the trial court was in error in sustaining the taxpayer's position because it is plain that the contracts do involve life contingencies.

It seems unlikely that in drafting such a provision as this, Congress would use a structure that doesn't make sense, which would be the case if we construed the section to mean "all amounts . . . which do not involve . . . contingencies." It is not plain how "an amount," presumably accrued on the books, could "involve, at the time of accrual, life, health, or accident contingencies." What does this mean? How does an amount ever involve anything? In order to give it meaning, the taxpayer must interpret it as saying "all amounts whose computation does not involve, etc."

On the contrary, the straightforward reading of the section points to the interpretation urged by the commissioner since it has a complete meaning as written. That is, "all amounts in the nature of interest . . . on insurance or annuity contracts . . . which do not involve, at the time of accrual . . . contingencies." Here it is plain that these contracts did involve "life, health, or accident contingencies" and, therefore under this interpretation the amounts did not meet the requirements of the section.

Moreover, as pointed out by the commissioner, substantial amounts earned on the reserves in excess of the 3½% rate, although not required or permitted to be retained as reserves, were nevertheless utilized by the company as part of the reserves to increase the size of the numerator of the fraction. If taxpayer is permitted to add as a third element of the numerator in addition to the life insurance reserves and the pension plan reserves, an item of interest which largely corresponds with untaxed investment income held for the company's use, this would clearly give a double benefit to the taxpayer for this item to the extent that they were the same.

We conclude, therefore, that a construction of § 805(e)(2) that the words "which do not involve, at the time of accrual, life, health, or accident contingencies" modify the word "contracts" rather than the word "amounts" is more nearly in accord with the Congressional purpose. The trial court erred in holding to the contrary.

## VII. ISSUES ON CROSS–APPEAL.

As stated by the taxpayer in its cross-appeal from those parts of the judgment of the trial court adverse to it, the issues on cross-appeal are:

(1) Whether the district court erred in holding that the cost of policies acquired through an assumption reinsurance transaction was not deductible in full in the year of the transaction;

(2) Whether the district court erred in holding that unearned interest on so-called policy loans constitutes taxable investment income;

(3) Whether the district court erred in holding that in computing the special deduction for increases in reserves for non-participating contracts under Sec. 809(d)(5), the reserves for contracts which become participating during the taxable year were includable in the beginning of the year reserves;

(4) Whether the district court erred in holding that losses for bad debts on advances to life insurance agents were not deductible in computing net investment income under Sec. 805;

(5) Whether the items of deferred and uncollected premiums on life insurance and annuity contracts, accident and health premiums due and unpaid, unearned interest on policy loans, advances to life insurance agents, amounts due from reinsurers, participation interest in reinsurance pools, unamortized cost of assumption reinsurance, mortgage escrow funds and amounts held by taxpayer

as agent or trustee for others constituted "assets" within the meaning of Sec. 805(b)(4) of the Internal Revenue Code.

## VIII. CROSS–APPEAL ISSUE NO. 1: CURRENT DEDUCTIBILITY OF AMOUNT PAID FOR ACQUISITION OF ATLANTIC LIFE INSURANCE COMPANY STOCK.

In 1961, taxpayer purchased the entire capital stock of the Atlantic Life Insurance Company from its sole stockholder, Life Companies, Inc. The total price for the acquisition was $128,226,896 which was represented by cash of $29,000,000, reserve requirements assumed $94,536,860, other liabilities assumed $4,690,036. Taxpayer received tangible assets agreed to have a fair market value of $118,798,778, leaving an excess of $9,864,131 which it allocated on its books to the value of the "insurance in force" acquired from Atlantic. It is not disputed that taxpayer was willing to pay this amount more than the fair market value of the assets it received because of its expectations of profiting in the future from the insurance contracts which had already been written by Atlantic. The taxpayer deducted the full amount of $9,864,131 as an ordinary and necessary business expense in the nature of commissions. The Commissioner disallowed the deduction but allowed the taxpayer to amortize the amount over the average life of the policies, determined to be ten years. The trial court sustained the Commissioner's position.

The Commissioner supports the trial court's decision upon the fundamental principle of federal taxation that the cost of acquiring a capital asset may not be currently deducted but rather must be amortized or depreciated over the useful life of the asset. On the other hand, the taxpayer contends that all costs of "putting policies on the books" are currently deductible as a cost of doing business whether such cost is represented by payments to salesmen currently selling the company's policies or in payment for the 100,000 policies theretofore written by Atlantic.

Treasury Regulation 1.87–4 supports the Commissioner's view of the matter. It provides:

*Special Rules.*

(d) Certain other reinsurance transactions. . . .

(ii) In connection with an assumption reinsurance (as defined in paragraph (a)(7)(ii) of § 1.809–5) transaction, a reinsurer shall in any taxable year beginning after December 31, 1957. . . .

(b) Treat any amount paid to the reinsured, to the extent such amount meets the requirements of section 162, as a deferred expense under section 809(d)(12) and amortize such amount over the reasonably estimated life (as defined in subdivision (iii) of this subparagraph) of the contracts reinsured, irrespective of the taxable year in which such amount was paid to the reinsured."

The taxpayer claims that this regulation has no statutory support, is contrary to the clear congressional mandate and is therefore invalid.

It cannot be gainsaid that the government's basic premise is correct. That is, as stated in *Woodward v. Commissioner of Internal Revenue*, 397 U.S. 572 at 574, 90 S.Ct. 1302, at 1304, 25 L.Ed.2d 577:

"Since the inception of the present federal income tax in 1913, capital expenditures have not been deductible. (Footnote omitted). *See* Internal Revenue Code of 1954, § 263. . . . If an expense is capital, it cannot be deducted as 'ordinary and necessary,' either as a business expense under § 162 of the code or as an expense of 'management, conservation, or maintenance' under § 212. (Footnote omitted)."

Thus, it is clear that unless there is some provision peculiar to the taxation of insurance companies that makes an exception to this rule the amount paid by the taxpayer here for the asset represented by the outstanding policies acquired from Atlantic cannot be deducted currently, but must be

deducted on an amortized basis as provided by the appropriate treasury regulation.[1]

▮ Moreover, this Court has heretofore analyzed the effect of such a contract. In *Mutual Savings Life Ins. Co. v. United States*, 488 F.2d 1142 (C.A.5 1974) we held expressly that "if the reinsurer has paid consideration for the policies, the payment cannot immediately be deducted, but must be amortized over the estimated life of the contracts." 488 F.2d 1142, 1144. Here, it is plain from the undisputed evidence at the trial, that the $9,800,000 was paid as consideration for the outstanding policies.

The taxpayer's effort to equate the current deductibility of commissions paid in the life insurance industry to agents who put new policies on the books of the company with the payment of $9,800,000 for the acquisition of some 100,000 outstanding policies is not an apt comparison. Atlantic has already paid commissions to its agents for the acquisition of these same policies and the value of the policies to the taxpayer here in no way represents that cost of putting the business on the books of the company. It represents, instead, an estimate of the current value to the taxpayer that is represented by having these policies on its books with the expectation of the continuing premiums to be paid in the future. This may or may not approximate the total loading cost to Atlantic. Certainly it cannot be said to proximate the amounts paid as commissions when the policies were originally solicited. Southwestern points to no statutory provision, other than the general statutory authorization for the deduction of current expenses on which it seeks to rely as a basis for its broad contention that any payment that may be required as a cost of putting the business on the books must be currently deductible.

The trial court correctly decided this issue in favor of the government.

## IX. CROSS–APPEAL ISSUE NO. 2: TREATMENT OF ADVANCE INTEREST ON POLICY LOANS.

▮ As provided for by the terms of the insurance policies issued by the taxpayer, Southwestern made loans to its policyholders, the insurance contracts providing such loans would be made up to the amount of the cash surrender value of the individual policy. Under the express terms of the policy, interest was paid in advance to the end of the policy year, and annually thereafter, in advance, on the policy anniversary date for the ensuing year. Payment of interest in advance could be accomplished in one of two ways. The policyholder could pay the company in cash for the year's interest or the company would advance to him the amount of the loan requested less 5% for the remaining term of the policy year. Interest for the ensuing policy year which was not paid in cash was added in advance to the amount of the principal debt. In either event, when cash was not paid for advance interest, the cash surrender value of the policy was reduced by such amount. Under the policy agreement, any prepayment of the loan before the end of the policy year would require repayment by the taxpayer of the rateable amount of unearned interest. The same thing occurred if the policyholder should surrender his policy for the cash value or if he should die during the policy year.

The taxpayer showed such amounts of interest for the entire term of the policy loan on its books as "interest on policy loans." Nevertheless, the taxpayer reported only such part of these payments as represented a rateable amount of interest up to the end of the tax year, rather than the full amount collected as investment income. The government contends, and the trial court held, that the entire amount

---

1. The taxpayer contends that this regulation does not fit a situation where the amount paid is not paid to the "reinsurer" but is paid to the owner of the reinsured's capital stock. This argument, it seems to us, backfires in the sense that if this agreement, which was a three-way contract including an agreement with the rein-

sured to reinsure its policies does not fall within the language of the regulations, because the purchase price was paid to someone other than the reinsured itself, it is clearly then the price paid by the taxpayer to acquire the capital stock of a life insurance company, which by all definitions would be a capital expenditure.

collected by the taxpayer as "interest on policy loans" was taxable when received or charged against the policy's cash surrender value.

The taxpayer undertakes to support a thesis that this transaction was not a loan at all, but merely a return to the taxpayer of a part of the value of his policy—in other words, a partial cash surrender.

The method which taxpayer used in keeping its books of account by accruing the entire amount of interest, even though taxpayer may, in the event of prepayment or death of the policyholder, be required to make a repayment of a rateable amount, is consistent with the accrual basis of accounting. There is no reason to permit the taxpayer, for tax purposes only, to treat a transaction which it and the policyholder expressly considered to be a loan and the payment of interest to be something entirely different. This is the view taken by the Court of Appeals for the Fourth Circuit in *Jefferson Standard Life Ins. Co. v. United States*, 408 F.2d 842, 856–857 (C.A.4 1969) and the Seventh Circuit in what we conclude is a comparable situation in *Franklin Life Ins. Co. v. United States*, 399 F.2d 757, 762–763 (C.A.7 1968).

Even though we were not to hold that the legal result is as followed by these two courts, it is true, as the government points out, that no proof was introduced in this record to show what proportion of the total amounts in dispute dealing with this issue were amounts actually paid in cash by the policyholder, and thus clearly reportable as interest and what amount was simply charged against the cash surrender value of the policy. The burden is, of course, on the taxpayer to show his entitlement to recover in a suit of this kind and such failure of proof would bar recovery of the amounts involved in this issue in any event. The trial court correctly held for the United States on this issue.

## X. CROSS–APPEAL ISSUE NO. 3: COMPUTATION OF SPECIAL DEDUCTION FOR INCREASES IN RESERVES UNDER § 809(d)(5) FOR THE YEAR DURING WHICH SUCH CONTRACTS BECOME PARTICIPATING CONTRACTS.

█ The taxpayer's claim here arises from a provision of the statute which provides a special deduction to insurance companies if during the year there is an increase in the company's reserves for its nonparticipating contracts.[2] This deduction amounts to 10 percent of the increase during the taxable year in a company's reserves for its nonparticipating contracts.

As pointed out by the taxpayer, Congress recognized that companies issuing nonparticipating contracts need an additional reserve cushion. The government does not contest the theory upon which Congress authorized this additional 10 percent deduction. It merely questions the manner in which the annual increase is computed.

The government takes the position that there is a clearly recognized amount on the taxpayer's books at the beginning of the year representing Reserves for Nonparticipating Contracts and that there is a corresponding figure at the end of the tax year. If the figure at the end of the year exceeds that at the beginning of the year, the government contends, then the 8.09(d)(5)

2. Section 809(d)(5) provides as follows:

"(d) Deductions. For purposes of subsection (b)(1) and (2) there shall be allowed the following deductions: . . .

(5) *Certain nonparticipating contracts.*—An amount equal to 10 percent of the increase for the taxable year in the reserves for nonparticipating contracts or (if greater) an amount equal to 3 percent of the premiums for the taxable year (excluding that portion of the premiums which is allocable to annuity features) attributable to nonparticipating contracts (other than group contracts) which are issued or renewed for periods of 5 years or more. For purposes of this paragraph, the term "reserves for nonparticipating contracts" means such part of the life insurance reserves (excluding that portion of the reserves which is allocable to annuity features) as relates to nonparticipating contracts (other than group contracts). For purposes of this paragraph and paragraph (6), the term "premiums" means the net amount of the premiums and other consideration taken into account under subsection (c)(1).

deduction of 10 percent of that difference is available to the taxpayer. The insurance company, on the other hand, claims that the difference should be greater than that arrived at by the simple calculation of subtracting the beginning figure from the closing figure for the year. It says that the reserves attributable to those contracts which are converted from nonparticipating to participating during the year should be excluded from the opening amount of capitalized reserves for nonparticipating contracts at the beginning of the year because there will be no reserves attributed to such contracts at the end of the year because in the meantime they have become participating contracts.

We conclude as did the trial court that this construction by the taxpayer is not based on any reasonable construction of the statute or regulations. Congress was concerned about the impact of an increase in any reserves required for nonparticipating contracts in gross, that is to say, it viewed the financial impact on a stock company, when compared with mutual insurance companies, by having to increase its reserves during a particular tax year. In our opinion, it makes no difference what caused the increase or decrease during the year, whether increased by the writing of new business or whether decreased by death of the policyholder, surrender of the policy or conversion from a nonparticipating to a participating contract. We conclude that the opening figure is to be subtracted from the closing figure and the 809(d)(5) deduction applied to the difference, as was decided by the trial court.

## XI. CROSS–APPEAL ISSUE NO. 4: LOSSES FOR BAD DEBTS ON ADVANCES TO LIFE INSURANCE AGENTS AS DEDUCTIBLE IN COMPUTING NET INVESTMENT INCOME.

During the years 1961 through 1965, Southwestern charged off as worthless bad debts, advances it had previously made to former life insurance agents no longer employed by the company. These amounts were substantial. Taxpayer claims a deduction of these amounts as for bad debt losses from gross investment income in determining net investment yield.

The taxpayer found it necessary in engaging life insurance agents to make advances to them until such time as they were producing enough commissions to maintain their standard of living. All income from the taxpayer earned by an agent is represented by commissions based on life insurance business written. The agents continued to receive such advances until such time as their commission exceeded their monthly advances and thereafter the excess over the monthly advance was applied to reduce the balance which had been accumulated. Only one out of three agents continue with the company for more than two years. Therefore many agents terminate their relationship before the entire amount of advances has been recovered by the taxpayer. It is clear from the record that when these advances are originally made they are made as a loan to the agent. The company charges 4 percent interest on the outstanding balances of the advances and sends a letter to the agent each month showing the state of his account. Following the termination of an agent, it is the taxpayer's policy and practice to leave all unpaid advances outstanding until such time as all commissions have been collected and applied to the account. Thereafter, for some period of time, a monthly statement is sent to the agent showing the amount of the unpaid advances and the amount of his commissions, if any. When the taxpayer has credited an agent's account with all of the commissions to which he is entitled, the agent is so advised in a letter as follows:

"Since the advances we made to you as an agent for our Company were in the form of a *loan* against your future commissions, we are required by the Internal Revenue Service to report as income to you, in the year in which it charged off, the portion of the indebtedness that was not repaid by the commissions credited to your account. . . ." [Emphasis added.]

With respect to this matter, the trial court made the following findings of fact:

"[T]he Court finds that in January of the year after all commissions generated

by agents who have been disassociated with the company are applied against the balances due from the advances previously made, the taxpayer writes off those balances as bad debts. . . . The Court further finds that it is an industry-wide practice to make these advances to new agents and that it is well understood within the industry that the insurance company will not proceed against agents to collect unrepaid balances following disassociation."

It is without dispute that no effort is made by the company either to ascertain the solvency and ability of such agents to repay to the company the amount of these advances or to collect them. The company does not even demand repayment, but instead merely cancels the amount on the books and notifies the former agent that it is reporting the cancellation for income tax purposes as though the amounts were being paid as income to the former agent.

From this state of the record, the trial court found that the taxpayer could not take a bad debt loss deduction for these sums in the tax year when the debts were forgiven.

> "The question of the worthlessness of [a] debt . . . is essentially one of fact. The burden rests on the petitioner to establish this fact by a preponderance of the evidence. *Lunsford v. Commissioner of Internal Revenue*, 5th Cir. 1954, 212 F.2d 878."

*Eagle v. Commissioner of Internal Revenue*, 242 F.2d 635 (5th Cir. 1957).

While the trial court did not announce a conclusion in his conclusions of law dealing with the deductibility of these items as bad debts, its judgment in favor of the government of the amounts represented by this issue was tantamount to a finding of fact that the plaintiff taxpayer had failed to meet this standard of proof. The trial court could not have found otherwise. The taxpayer elected to call this advance a loan and treated it as a loan bearing interest at 4 percent. The forgiveness of the amount was also described in the last communication from the company to the agent as a "loan." While it is not required that

legal action to enforce collection be taken to establish worthlessness where there is a factual basis for the finder of facts to determine that a debt is worthless and uncollectible, Treasury Regulations § 1.166–2(b), there is no justification for the theory that a debt can be deducted as worthless under § 166 merely because the creditor elects not to enforce the obligation. *See* for discussion, 5 Mehrten's Law of Federal Income Taxation, § 30.39, pp. 98–99.

Furthermore, there is no more merit in taxpayer's contention as an alternative, if the Court holds that a bad debt deduction is not available, then the advances should be considered as additional compensation to the former agents at the time payments were made. These payments were not intended by the parties to be compensation when the advances were made, but were considered by the parties to be the creation of a debt. To be sure the forgiveness of the debt, at a period considerably later, after termination of employment, did create an obligation on the part of the former agent to report a forgiveness of the debt as income to him at the time it occurred. That is the only year in which the debt was translated into additional compensation to the former agent.

The trial court's judgment against the taxpayer with respect to this item was correct.

XII. CROSS–APPEAL ISSUE NO. 5: ARE (A) DEFERRED AND UNCOLLECTED PREMIUMS ON LIFE INSURANCE AND ANNUITY CONTRACTS (B) "UNEARNED" INTEREST ON POLICY LOANS; (C) ADVANCES TO INSURANCE AGENTS; (D) AMOUNTS DUE FROM REINSURERS; (E) TAXPAYER'S PARTICIPATION INTEREST IN REINSURANCE POOLS; AND (F) THE UNAMORTIZED COST OF INSURANCE POLICIES IN FORCE ACQUIRED FROM ATLANTIC LIFE "ASSETS" OF THE TAXPAYER WITHIN THE MEANING OF § 805(b) OF THE CODE?

In stating this issue, we have utilized the statement from the government's brief

rather than that of the cross-appellant, because the taxpayer lumps together under this issue two other items with which we have already treated in this opinion, to-wit: (1) whether accident and health premiums due and unpaid and (2) mortgage escrow funds in amounts held by taxpayer as agent or trustee for others are "assets" within the meaning of § 805(b).

Southwestern makes an underlying argument in its attack on the government's position that these items are to be considered within the definition of "assets" under § 805(b). This argument, briefly put, is that the term "assets" as used in this section was intended to include only those items of property which actually produced income and were includable as investments under § 804(b), plus money belonging to the company; that items which do not actually contribute to investment income, as this argument goes, arise out of the insurance trade or business, and therefore under the definition section do not belong to the taxpayer or do not constitute property and are excludable from the asset definition. As was the trial court, we remain unconvinced that the legislative history requires a construction of the definition of assets so limited as propounded by the taxpayer. However, we no longer need consider this question, because it has been answered definitively by the Supreme Court in *Commissioner of Internal Revenue v. Standard Life & Accident Insurance Co.* (No. 75–1771), —— U.S. ——, 97 S.Ct. 2523, 53 L.Ed.2d 653, dec. June 23, 1977. This follows inevitably from the decision of the Supreme Court which held that the "net valuation" portion of unpaid life insurance premiums must be included in a life insurance company's assets, the issue discussed *infra* under A. It is clear that no part of such unpaid premiums produce any income for the taxpayer, yet the court found them to be assets.

### A. Deferred and Uncollected Premiums.

As is common in the life insurance industry, taxpayer's policyholders may elect to pay premiums on life insurance and an-nuity contracts in semi-annual, quarterly or monthly installments. The portions of the gross annual premiums which are not due until after December 31 of each year, and which in fact remain unpaid as of that time, are generally referred to as "deferred" premiums. Furthermore, as a general rule such contracts provide for a grace period during which the policy remains in force notwithstanding the failure of the insured to pay the required premium. At the end of the years in issue, taxpayer had a number of policies in force by virtue of the grace period provision. Premiums owing but uncollected with respect to those policies as of December 31 of each year are normally referred to as "due and unpaid." We refer to these two classifications as "deferred and uncollected" premiums. The method of dealing with these items for tax purposes has been much mooted in the courts, this Court in *Western National Life Insurance Co. of Texas v. Commissioner of Internal Revenue*, 432 F.2d 298 (5th Cir. 1970) having held that since the insurance companies accrued these items in computing their reserves they would have to accrue them for all other purposes, including inclusion as assets under § 805(b)(3). Other Circuits arrived at the same conclusion, *see Jefferson Standard Life Ins. Co. v. United States*, 408 F.2d 842 (C.A.4 1969), *cert. denied* 396 U.S. 828, 90 S.Ct. 77, 24 L.Ed.2d 78; *Western & Southern Life Ins. Co. v. Commissioner of Internal Revenue*, 460 F.2d 8 (6th Cir. 1972), *cert. denied* 409 U.S. 1063, 93 S.Ct. 555, 34 L.Ed.2d 517; *Franklin Life Ins. Co. v. United States*, 399 F.2d 757 (7th Cir. 1968). The Court of Appeals for the Tenth Circuit disagreed, *Standard Life & Accident Ins. Co. v. Commissioner of Internal Revenue*, 525 F.2d 786 (10th Cir. 1976), and created a conflict which has now been resolved by the Supreme Court.

The Supreme Court recognized that the statute which in § 818 provided for the use for computation purposes either of an accrual method of accounting or a combination of an accrual method with any other except cash receipts and disbursements further provided "except as provided in the preceding sentence, all such computations

shall be made in a manner consistent with the manner required for purposes of annual statement approved by the National Association of Insurance Commissioners." The Court then said:

> The legislative history makes it clear that the accounting procedures established by the NAIC apply if they are 'not inconsistent' with accrual accounting rules. (Footnote omitted). In other words, except when the rules of accrual accounting dictate a contrary result NAIC procedures 'shall' apply. (Footnote omitted)." —— U.S. at ——, 97 S.Ct. at 2529.

*Commissioner of Internal Revenue v. Standard Life & Accident Ins. Co., supra.*

The NAIC procedure as to the treatment of deferred and unpaid premiums is to require the inclusion of the "net valuation" portion of such premiums but not the "loading" portion in the reserves and also in the assets. The "net valuation premium" is that part of the premium determined under mortality and interest assumptions that must be held to assure that the company will have sufficient funds to pay death benefits. The rest of the premium is called "loading" and covers profits and expenses such as salesmen's commissions, state taxes, and overhead.

The trial court's treatment of this item was in accord with our earlier decision in the *Western National Life* case which has now been partially overruled. The final disposition of the amounts involved under this issue can, however, be readily ascertained, since the Court has now mandated the treatment of this item for tax purposes in the same manner as is required to be accounted for in the statement prescribed by NAIC.

### B. *"Unearned" Interest on Policy Loans.*

■ In Part IX, *supra*, we held that the amount charged by the company as interest on policy loans to its policyholders is includable in taxpayer's investment income. In doing so, we rejected taxpayer's argument that such amounts were not truly interest because the policy loans were not real loans.

Taxpayer here argues that such accrual interest is not includable as an asset for the same reason. We reject this argument for the same reason.

We have heretofore held that such interest is to be accounted for as income because such policy loans are to be treated for tax purposes as the "loan" which the company says they are in its dealings with its policyholders.

The trial court therefore correctly held that this item should be included in the § 805(b) assets.

### C. *Advances to Insurance Agents; (D) Amounts Due From Reinsurers; (E) Taxpayer's Participation Interest in Reinsurance Pools; and (F) The Unamortized Cost of Insurance Policies in Force Acquired from Atlantic Life.*

■ Aside from its underlying argument, previously discussed, to the effect that only those assets which produced income are to be included under § 805(b), an argument now foreclosed by *Standard Life, supra,* taxpayer cites no authority for its contention that the trial court erred in its disposition of these four last issues. The amounts representing each of these items, as recognized by the trial court, must be included in assets because of the broad definition of the term used in the statute and the underlying regulations as interpreted by the courts. See *Jefferson Standard Life Ins. Co. v. United States,* 408 F.2d 842 (4th Cir. 1969) and regulations § 1.805–5(a)(4)(iii), § 1.805–5(a)(4)(i).

The judgment is vacated and the case is remanded to the trial court for further proceedings consistent with this opinion. Each party shall bear its own costs.