T.C. Memo. 1998-377


UNITED STATES TAX COURT


ROBERT C. COBORN, SR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16842-94.                    Filed October 19, 1998.


<u>Mark A. Pridgeon</u>, for petitioner.

<u>David L. Zoss</u>, for respondent.


MEMORANDUM OPINION


SWIFT, <u>Judge</u>:  Respondent determined deficiencies of
$249,919, $96,478, $5,627, and $16,300, respectively, in
petitioner's Federal income taxes for 1988, 1989, 1990, and 1991.

The issue for decision is whether petitioner is entitled to a claimed $1.6 million nonbusiness bad debt deduction relating to funds transferred to a closely held corporation.

## Background

Petitioner resided in St. Cloud, Minnesota, at the time the petition was filed.

On June 16, 1972, petitioner became holder of stock in Environmental Protection Laboratories, Inc. (EPL), a newly formed Minnesota corporation established, among other things, to develop products relating to laboratory testing and to environmental monitoring equipment.

Beginning in 1983 and through January of 1990, petitioner was the controlling shareholder of EPL. One of petitioner's business objectives for EPL was for EPL to become sufficiently successful and profitable so that the stock in EPL could be sold to a third party at a large profit.

In 1983, petitioner's son, Robert C. Coborn, Jr., became EPL's president. Over the years, petitioner invested heavily in EPL, in part, to financially support the corporation of which his son was president.

In the early 1980's, it was estimated that EPL would need $1.5 to $1.9 million in additional capital funds to implement for EPL the business plan that petitioner, his son, and others had developed.

Between 1972 and 1988, petitioner transferred at least $1,571,429 to EPL.

Over the years, EPL obtained a number of loans from banks. These loans were personally guaranteed by petitioner. Funds that petitioner individually transferred to EPL were not secured and were subordinated to bank loans EPL obtained.

Not until September of 1990 did petitioner take steps to secure funds he alleges to have loaned to EPL.

Between 1973 and 1984, a series of purported promissory notes were executed on behalf of EPL and in favor of petitioner that apparently related to some of the funds petitioner transferred to EPL. Neither petitioner nor EPL, however, maintained adequate, current documentation and accounting records reflecting funds petitioner transferred to EPL. Certain documentation relating to the funds petitioner transferred to EPL appears to have been originated not at the time the funds were transferred but in later years.

Of the $1,571,429 that petitioner alleges constituted funds he loaned to EPL, $729,248 thereof is not reflected by any purported promissory notes.

At some point in time, an undated document was executed on behalf of EPL and in favor of petitioner indicating that petitioner agreed to loan over an unspecified period of time an

unspecified amount of funds to EPL and that EPL would repay the funds on demand with interest at a rate of 14 percent per annum.

On petitioner's Federal income tax returns for the years in issue, the reporting of interest income by petitioner relating to funds petitioner received from EPL and relating to the alleged loans petitioner purportedly made to EPL is erratic and inconsistent. In some years, petitioner received no funds from EPL, but petitioner reported on his income tax returns interest income received from EPL. In other years, petitioner reported on his income tax returns more or less in interest income than the total funds he received from EPL. In some years, petitioner reported none of the funds he received from EPL as interest income. The schedule below indicates, for some years, the amounts of funds petitioner apparently received from EPL and the amounts petitioner reported on his respective Federal income tax returns as interest income received from EPL:

| Year | Funds Petitioner Received From EPL | Funds Reported As Interest Income |
| --- | --- | --- |
| 1979 | -0- | $ 4,965 |
| 1984 | $ 2,400 | 6,286 |
| 1985 | -0- | 14,125 |
| 1986 | 52,469 | -0- |
| 1987 | 45,267 | 3,600 |
| 1988 | 48,454 | 6,000 |

On a final decree of divorce between petitioner and his wife dated January 12, 1987, it is stated that petitioner is awarded debt owed by EPL to him in the amount of $591,606.

In July of 1988, apparently before petitioner made any claim that the debt purportedly owed to him by EPL was worthless, EPL's financial statements for 1986 were prepared and reflected total assets of $3,029,877 and total stockholder equity of $552,097. Included among the reported assets was an asset with a stated value of $2,369,810 that was described as "Fair Market Value of Product Rights". In September of 1990, apparently after petitioner made the claim that purported debt owed to him by EPL was worthless, EPL's financial statements for 1987 and 1988 were prepared, and the above asset was omitted from the financial statements.

EPL experienced some degree of success. Between 1983 and 1987, EPL's gross receipts increased by over 400 percent. According to EPL's books, however, from 1984 through 1987, no net profits were realized by EPL, and EPL had a negative net worth. In 1988, EPL became delinquent in the payment of employment taxes, and EPL's board of directors considered filing a bankruptcy petition.

Petitioner and his son, however, decided not to file a bankruptcy petition on behalf of EPL because such a step would disrupt EPL's employee, vendor, banking, and customer relationships and would damage EPL's trade name. Further, in 1988, petitioner and his son still considered EPL's business

prospects good, and petitioner anticipated the possible private or public sale of the stock of EPL.

In 1988, no appraisals relating to the value of EPL as a business were obtained.

The evidence does not indicate that petitioner ever made demand on EPL for repayment of his purported loans to EPL, nor does the evidence indicate that petitioner ever undertook steps to otherwise collect from EPL the purported loans.

In 1988, in anticipation of, among other things, a possible sale of EPL's stock and in an effort to enhance the financial statements of EPL, petitioner went through the exercise of "forgiving" $1.6 million in purported debt of EPL to petitioner relating to funds that petitioner over the years had transferred to EPL.

After 1988, EPL continued to operate as a business. Petitioner and his son attempted to sell the stock of EPL in a public offering, and petitioner continued to transfer funds to EPL. In 1989, 1990, and 1991, petitioner transferred to EPL funds totaling $616,169, and petitioner received from EPL funds totaling $573,282. The evidence does not indicate the existence of any promissory notes or other debt instruments relating to the funds that petitioner, after 1988, transferred to EPL.

In 1989, in seeking outside investment capital, a new comprehensive business plan for EPL was adopted.

By 1992, EPL had changed its name to Micro Bio Logics, Inc. (MBL), and in 1992 MBL conducted an unsuccessful public offering of its common stock and warrants.

On EPL's original and amended 1988 corporate Federal income tax returns, $1.6 million in forgiveness of indebtedness income was reported relating to the $1.6 million in purported debt to petitioner that petitioner in 1988 allegedly forgave.

Based on EPL's 1988 corporate Federal income tax return, but for the $1.6 million in forgiveness of indebtedness income that was reported, EPL would have reported on its 1988 corporate Federal income tax return a net operating loss for 1988 in the amount of $717,119.

As a result of its 1988 operations and its net operating loss carryforward from prior years, the $1.6 million in forgiveness of indebtedness income that EPL reported for 1988 did not result in any reported tax liability for EPL.

Further, in January of 1988, petitioner sold his stock in Coborn's, Inc. (Coborn), another closely held corporation in which petitioner had an interest, and petitioner realized from this sale a long-term capital gain of $2,044,988. In 1988, 1989, 1990, and 1991, petitioner recognized and reported $855,089, $451,494, $30,786 and $34,730, respectively, of this capital gain.

On petitioner's 1988, 1989, 1990, and 1991 Federal income tax returns, the $1.6 million claimed nonbusiness bad debt deduction (and the carryovers thereof) relating to petitioner's purported loans to EPL significantly offset the capital gains reported from the sale of petitioner's stock in Coborn.

## Discussion

Losses on nonbusiness bad debts are treated as sustained in a particular year only if the entire debt becomes totally worthless during the year. Riss v. Commissioner, 478 F.2d 1160, 1165-1166 (8th Cir. 1973), affg. in part and remanding 56 T.C. 388 (1971); sec. 1.166-5(a)(2), Income Tax Regs. The taxpayer must show some identifiable event or group of facts that proves worthlessness. American Offshore, Inc. v. Commissioner, 97 T.C. 579, 593-594 (1991). A debt does not become worthless merely because a creditor decides not to enforce the debt. Southwestern Life Ins. Co. v. United States, 560 F.2d 627, 644 (5th Cir. 1977). Declining business, lack of profits, or poor financial condition do not necessarily establish worthlessness of a debt. Intergraph Corp. v. Commissioner, 106 T.C. 312, 323 (1996), affd. per curiam without published opinion 121 F.3d 723 (11th Cir. 1997). This is particularly true where a debtor continues to operate as a going concern and where the creditor continues to extend funds to the debtor. Id. and cases cited therein.

The evidence establishes that, after 1988, EPL continued to operate as a business. Petitioner continued to seek a sale of the stock of EPL, and EPL conducted ongoing business activity. In 1989, a new business plan for EPL was formulated, and in 1992 a public offering of EPL stock occurred. Significantly, after 1988, petitioner continued to transfer funds to EPL. The evidence does not demonstrate that EPL's purported debt to petitioner became worthless in 1988.

For the reasons stated,

<u>Decision will be entered for respondent</u>.