**SOUTHWESTERN LIFE INSURANCE COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 177–81T.**

United States Claims Court.

Oct. 31, 1985.

Larry L. Bean, Dallas, Texas, with whom was Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for plaintiff. William B. Harman, Jr., Washington, D.C., of counsel.

Theodore Peyser, Jr., Washington, D.C., with whom were Asst. Attys. Gen. Glenn L. Archer, Jr., Robert C. Markham, and Michael J. Dennis, for defendant.

## OPINION

WILLI, Senior Judge.

Plaintiff, a stock life insurance company domiciled in Texas and therefore regulated by the Texas State Board of Insurance, sues to recover taxes paid in response to deficiency assessments made following audit of its returns for each of the years 1966 thru 1970. After settlement of several of the issues on which suit was brought, three areas of dispute remained for trial. They were: (1) the includability among assets, for purposes of section 805(b)(4),[1] of mortgage escrow funds collected directly by plaintiff and deposited in its general bank account;[2] (2) the deductibility, under section 804(c)(1), of interest that plaintiff, in its discretion, allowed policyholders of its deferred annuities in excess of the interest guaranteed by their policies, and (3) the includability in plaintiff's life insurance reserves, as defined by section 801(b)(2), of deferred premiums.[3]

Though it seems generally understood that uncollected premiums stand on the same footing as deferred in the context of includability in reserves, *Commissioner v. Standard Life & Accident Ins. Co.*, 433

---

**1.** Unless otherwise indicated, all section references herein are to the Internal Revenue Code of 1954, as amended, and as applicable to the period in suit.

**2.** The parties have settled this issue as it pertains to escrow funds arising out of mortgages originated by plaintiff's mortgage correspondents.

**3.** The last mentioned issue was injected into the case by the government as an additional defense. The parties have stipulated that this assertion of a tax indebtedness that is itself time-barred of assessment and collection and is therefore available only to reduce a recovery otherwise found due the plaintiff, remains viable in this action (by reason of the previous settlements) even if plaintiff achieves no recovery on the two issues that it presses to decision.

U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977), the defendant conceded at trial and later on brief (in both instances without explanation) that it was not contesting plaintiff's right to include uncollected premiums in its life insurance reserves.

The facts pertinent to each of the three issues mentioned above are detailed in the findings of facts accompanying this opinion and will be repeated here only to the extent necessary to an understanding of the results reached.

### *Mortgage Escrow Funds*

Mortgage lending was one type of investment that plaintiff made with its premium receipts. Loans secured by mortgages were made both directly by plaintiff and, for its account, by third-party mortgage correspondents.

All of plaintiff's mortgage loans required the borrower to make monthly payments of not only principal and interest but an additional amount to be used in the future for the payment, when due, of insurance premiums, property taxes and any other assessments that were payable on the mortgaged property. It is with the tax status of this latter amount in plaintiff's hands, hereafter called mortgage escrow funds, that we are here concerned; but only as to loans made directly by plaintiff. N. 2, *supra.*

While maintaining a system of ledger accounts by which it accounted separately on its books for mortgage escrow payments as received, plaintiff routinely deposited those items together with its other business receipts in its non interest-bearing general bank account. Nothing in the underlying mortgage or related debt instruments rendered such handling of the escrow receipts unlawful or even inappropriate.

The amount of a life insurance company's assets bears relevantly on the statutory formula that determines the portion of investment income earned by it on which it is taxed (the remainder being deemed attributable to its policyholders). Assets, for purposes of that formula, are defined by section 805(b)(4) as follows:

> * * * the term 'assets' means all assets of the company * * *, other than real and personal property (excluding money) used by it in carrying on an insurance trade or business. * * *

With one notable exception involving plaintiff itself,[4] almost[5] all of the courts[6] that have passed on this issue have concluded, albeit on varying factual patterns[7] and uniformly without reference to authorita-

4. *Southwestern Life Ins. Co. v. United States,* 560 F.2d 627 (5th Cir.1977), hereafter referred to as *Southwestern I.*

5. *Bankers Life Co. v. United States,* 412 F.Supp. 62 (S.D.Iowa 1976) *aff'd on rehear. en banc,* 587 F.2d 893 (8th Cir.1978), that affirmance having been by an equally divided court, settled no principle of law or issue of fact. *Neil v. Biggers,* 409 U.S. 188, 191–92, 93 S.Ct. 375, 378–79, 34 L.Ed.2d 401 (1972).

6. *Liberty Nat'l Life Ins. Co. v. United States,* 463 F.2d 1027 (5th Cir.1972); *Franklin Life Ins. Co. v. United States,* 67–2 USTC ¶ 9515, 19 A.F.T. R.2d 1734 (S.D.Ill.1967), *rev'd on other issues,* 399 F.2d 757 (7th Cir.1968), *cert. denied,* 393 U.S. 1118, 89 S.Ct. 989, 22 L.Ed.2d 123 (1969); *Jefferson Standard Life Ins. Co. v. United States,* 272 F.Supp. 97 (M.D.N.C.1967), *aff'd* and *rev'd,* 408 F.2d 842 (4th Cir.1969) *cert. denied,* 396 U.S. 828, 90 S.Ct. 77, 24 L.Ed.2d 78 (1969); *Monumental Life Ins. Co. v. United States,* 76–2 U.S. T.C. ¶ 9787, 39 A.F.T.R.2d ¶ 77–306 (Ct.Cl.1976); *Bankers Union Life Ins. Co. v. Commissioner,* 62

T.C. 661 (1974); *National Life Ins. Co. v. United States,* 207 Ct.Cl. 992, 521 F.2d 1406 (Order, June 27, 1975); and, *Ohio National Life Ins. Co. v. United States,* 75–1 U.S.T.C. ¶ 9125, 35 A.F.T. R.2d 75–445 (S.D.Ohio 1974).

Except for *Monumental Life, supra,* the result [*i.e.,* that mortgage escrow funds held by an issuer-mortgagee are not a part of its assets for purposes of section 805(b)(4) ] in each of the above cases rested on the conclusion that the insurer held the escrow funds as a trustee. Respected text authority labels that conclusion as illustrative of the maxim that hard cases make bad law. Bogert, *Trusts & Trustees,* § 45 pp. 301–02 (Rev. 2d ed. 1984).

7. For example, in *Monumental Life, supra,* it was expressly found that the carrier segregated all mortgage escrow funds from its general business receipts and held them in a separate custodial bank account. Finding 12, *infra.* Moreover, and most importantly, in *Monumental* no evidence was adduced addressing the proposition that the insurer's borrowing position with

tive[8] contrary decisions of the highest courts of several states,[9] that mortgage escrow funds held by an insurance carrier are not a part of its assets, as defined by section 805(b)(4).

■ The principle of collateral estoppel[10] renders the noted exception, plaintiff's own tax refund suit for earlier years (1965–1968), controlling here as a final adjudication of the precise question now presented. Moreover, as will appear, that prior decision was indisputably correct as a matter of law. It therefore merits additional deference under the separate doctrine of *stare decisis.*[11]

On a factual record differing from the present one in only a single but legally inconsequential respect, to be later addressed, the Fifth Circuit in *Southwestern I, supra,* ruled that plaintiff's mortgage escrow funds were a part of its assets for purposes of section 805(b)(4). In so doing the court reversed the district court which had decided otherwise on the authority of an earlier Fifth Circuit decision, *Liberty National Life Ins. Co. v. United States,* 463 F.2d 1027 (1972).

Just as here and in *Southwestern I,* the mortgage escrow funds in *Liberty National* were commingled with the insurer's general receipts. Nonetheless, the court held

there that the funds were not among the insurer's section 805 assets, essentially because of its stark conclusion that: "In holding these escrow funds Liberty serves as trustee." 463 F.2d at 1029.

Exposing the infirmity of the quoted premise of the earlier decision, as applied to both the record there and that before it, the *Southwestern I* panel explained, 560 F.2d at 633:

The Court did not refer to the actual language of the mortgage instruments to show the basis for its determination that 'the monies received are held for the use of the mortgagors. Liberty cannot lawfully disburse these funds for any other purpose than in satisfaction of the trust arrangements.' 463 F.2d at 1029.

The difficulty here is that we do not know what was stated in the mortgage documents referred to in the *Liberty National* case to cause the court to hold that the monthly payments of the escrow amounts created a trust for the mortgagor with the insurance company as trustee; nor, in this case, do we know the terms of the agreements between mortgagors and insurance company. The company, as plaintiff in this refund suit, did not deem it necessary to prove the

the custodial bank was in any way improved by the former's willingness to leave substantial funds on deposit in a non-interest-bearing account. Assuming that the charges for which the escrow funds were collected by the insurer-mortgagee were payable annually, approximately one-half of all escrow payments collected by the insurer and deposited in the interest-free separate account could be fairly characterized as constituting at least a *de facto* compensating balance in support of such borrowings as the insurer made from the custodial bank. That maintenance of a compensating balance yields very real benefits to a depositor-borrower is well-recognized. *Matter of Penn Central Transp. Co.,* 458 F.Supp. 1234, 1329 (E.D.Pa.1978). The possibility that such benefits might be sufficient to constitute deposited escrow funds as a part of the depositor's assets for purposes of section 805(b)(4) was not explored in *Monumental* because of a failure of proof of underlying facts, including the taxpayer's borrowing activity with the depository bank. *But see Langford v. Shamburger,* 392 F.2d 939, 944 (5th Cir.1968), cited with approval in *Southwestern I, supra,* at 635,

holding that tangible benefit in such circumstances is self-evident. Accordingly, it may very well be that, despite evidentiary deficiencies, *Monumental* was just wrongly decided on this issue.

**8.** *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

**9.** *Surrey Strathmore Corp. v. Dollar Sav. Bank,* 36 N.Y.2d 173, 366 N.Y.S.2d 107, 325 N.E.2d 527 (1975); *Brooks v. Valley Nat'l Bank,* 113 Ariz. 169, 548 P.2d 1166 (1976); *La Throp v. Bell Fed. Sav. & Loan Ass'n,* 68 Ill.2d 375, 12 Ill.Dec. 565, 370 N.E.2d 188 (1977), *cert. denied,* 436 U.S. 925, 98 S.Ct. 2818, 56 L.Ed.2d 768 (1978).

**10.** *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

**11.** Any departure from the doctrine of *stare decisis* demands special justification. *Arizona v. Rumsey,* 467 U.S. 203, 209, 104 S.Ct. 2305, 2309, 81 L.Ed.2d 164 (1984).

terms under which these payments were made to the taxpayer. Thus, proof is lacking on whether the agreement created a trust of the kind alluded to in *Liberty* or merely created the relation debtor and creditor.

\* \* \* \* \* \*

Finally, noting the absence both of the factual elements essential to the creation of an express trust and proof of custodial misconduct necessary to impose a constructive trust, the *Southwestern I* court aptly characterized the mortgagor-mortgagee relationship, as applied to the escrow funds, as purely contractual. 560 F.2d at 634.

The Court's explication of the preclusive doctrine of collateral estoppel in *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), includes an enumeration of the inquiries determinative of the doctrine's applicability. They are; (1) whether the issue in the pending litigation is in substance the same as that previously decided, (2) whether controlling facts or legal principles have changed significantly in the interim, and (3) whether other special circumstances warrant exemption from preclusion. 440 U.S. at 155.

Given the indisputable identity of the present issue with that decided in *Southwestern I* and the conspicuous absence of any special circumstances warranting departure from the result reached there, plaintiff's arguments in avoidance of preclusion are confined to the second of the three categories of inquiry prescribed by the Supreme Court. In that context it urges a change in both factual pattern and legal climate.

As a preliminary to its specific claim of factual distinction, plaintiff accurately observes that it lost in *Southwestern I* because of its failure to prove the facts necessary to establishment of the trust status for which it there contended. For that reason, plaintiff asserts, the judgment rendered against it was not an adjudication on

the merits and therefore not a suitable predicate for collateral estoppel. The law is to the contrary. There can be no question but that in a tax refund suit a judgment entered against a taxpayer for failure of proof is nonetheless a judgment on the merits as to the issues presented and therefore binding on him, by virtue of collateral estoppel, in subsequent litigation of one or more of those issues. *Fairmont Aluminum Co. v. Commissioner*, 222 F.2d 622, 625 (4th Cir.1955), *cert. denied*, 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748 (1955); *accord* 1 B.J. Moore, *Federal Practice*, ¶ 0.422 at 3406.

According to plaintiff, the particular factual dissimilarity disqualifying collateral estoppel here is the evidence that, unlike the situation in *Southwestern I*, at least some of the mortgage indentures in the present record specify that the mortgage escrow payments received from borrowers are to be held "in trust" to pay charges against the indentured property when due.

First, it should be noted that the parties have stipulated in this proceeding that the security instruments in the present record are generally the same in content as those in the record of *Southwestern I*, and further, that a majority of such instruments now before the court were a part of the record in *Southwestern I*. Finding 4, *infra*.

■ More importantly, the mere presence, standing alone,[12] of "in trust" language in some of the security agreements in the present record does not bear significantly on the question of whether plaintiff held .the escrow payments as a bona fide trustee. This is true both under Texas law and generally. *Costello v. Hillcrest State Bank of University Park*, Tex.Civ.App., 380 S.W.2d 780, 782 (1964); *Clark v. Wisdom*, Tex.Civ.App., 403 S.W.2d 877, 883 (1966); *Judd v. First Federal Sav. and Loan Assn.*, 710 F.2d 1237, 1241–42 (7th

---

**12.** Plaintiff has adduced no evidence relating either to indicia of any mortgagor-payor's intention to create a trust respecting mortgage escrow monies collected by plaintiff or to its own

assumption and discharge of traditional fiduciary duties as to such monies while in its custody. *Restatement, Second, Trusts* §§ 2, 23, 24.

Cir.1983); Bogert, *Trusts & Trustees*, § 45 pp. 475–76 (Rev. 2d ed. 1984).

An intervening change in legal climate, plaintiff's other argument in avoidance of the mortgage escrow holding in *Southwestern I*, is equally unavailing.

■ The embodiment of the change, plaintiff says, is the Eighth Circuit's 1978 affirmance of a district court holding in *Bankers Life Ins. Co. v. United States*, 412 F.Supp. 62 (S.D.Iowa 1976), that the mortgage escrow funds held by the taxpayer were not to be included in the assets under section 805(b)(4). The difficulty with the point, as previously explained,[13] is that the affirmance was by an equally divided court and therefore settled no principle of law or issue of fact. *Neil v. Biggers*, 409 U.S. 188, 191–92, 93 S.Ct. 375, 378–79, 34 L.Ed.2d 401 (1972). Accordingly, no relevant change in legal climate occurred.

Finally, not the least persuasive reason for following the *Southwestern I* court's refusal to find a trust relationship in plaintiff's mortgage escrow dealings is the manifest correctness of that conclusion.[14]

In deciding as it did, the *Southwestern I* court did not stop at simply declining to find the existence of a trust. Instead, it proceeded to affirmatively and accurately characterize the legal effect of the escrow payment transactions, saying (560 F.2d at 634):

> So far as the record discloses the company had every right to consider that its receipt of these funds from the various mortgagors created merely an obligation to pay the taxes and insurance when they became due, a contractual obligation and nothing more.

■ As to mortgage escrow funds, the loan indentures in the present record, whether or not containing "in trust" language, impose no obligations on plaintiff beyond those identified in *Southwestern I*. Finding 4, *infra*. In short, while the escrow receipts were in plaintiff's possession, it was legally free to use them as its own. Where the custodian enjoys such latitude, the transaction represents a contract for the benefit of a third party and therefore, by authoritative definition, not a trust. *Restatement, Second, Trusts* § 14, Comment g, Bogert, *Trust & Trustees*, § 21, p. 299 (Rev. 2d ed. 1984).

In sum, both collateral estoppel and *stare decisis* require adherence here to the determination in *Southwestern I* that mortgage escrow funds held by the plaintiff were a part of its assets as comprehended by section 805(b)(4).

### *Additional Interest*

As a life insurance company, plaintiff's tax liabilities for the years in suit are governed by the terms of the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112, codified as sections 801–820 of the Internal Revenue Code. The background and details of the features of that legislation pertinent to both this issue and that dealing with the includability of deferred premiums in reserves, to be later addressed herein, are amply illuminated in *United States v. Atlas Ins. Co.*, 381 U.S. 233, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965), and *Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977).

The referenced legislation provides a three-phase procedure for the taxation of companies such as plaintiff. It is only with the first of those phases that this issue and that which follows are concerned. Taxable income under that phase represents the insurer's share of so-called investment yield, defined by section 804(c) as consist-

---

**13.** Footnote 5, *supra*.

**14.** A strong hint of correctness is supplied by the statute applicable to such transactions generally. Since its enactment the Texas Trust Act has governed the creation of trusts in that state. Texas Trust Act, Acts 1943, 48th Leg., p. 232, Ch. 148, § 1, Art. 7425b–2 provides:

> *Definition of trust.* 'Trust' for the purpose of this Act means an express trust only, and *does not include * * * security instruments such as deeds of trust, mortgages* and conditional sales contracts. (Emphasis added.)

ing of income from interest, dividends, rents, royalties and other investment sources less investment expenses and deduction of exempt interest and other items. Conceptually then, investment yield may be fairly regarded as approximating net income from investments.

Apportionment of investment yield as between the insurer and its policyholders called for by the Act reflects both Congress' recognition (1) that life insurance companies are required by state law to maintain policyholder reserves to meet future claims and (2) that they normally add to those reserves a large portion of their investment income and its conclusion that, accordingly, these reserve increments should not be subject to tax. Section 804(a)(1) provides the mechanism for making this apportionment. It directs that the policyholders' share of each item of investment yield to be excluded from the insurers' taxable income "... shall be that percentage obtained by dividing the policy and other contract liability requirements by the investment yield...." In turn, section 805(a) defines "policy and other contract liability requirements" as the sum of:

1) the adjusted life insurance reserves, multiplied by the adjusted reserves rates,

2) the mean of the pension plan reserves at the beginning and end of the taxable year, multiplied by the current earnings rate, and

3) the interest paid.

It is with the foregoing in mind that the additional interest issue is considered.

One important element in the actuarial formulation of guaranteed future benefits payable under annuity-type policies, such as those involved here, is the rate of interest deemed earned on the premium dollars collected by the insurer over the period during which those dollars are held by it. That element, known as the assumed rate of interest, is of importance to both the policyholder and to the state authorities who regulate the insurer's business, the former's concern being with securing maximum future benefits for premium dollars paid in while the latter's is with the insurer's financial ability to fully meet its claim obligations as they arise. It is to assure that ability that state regulatory authorities require establishment and maintenance of the reserves mentioned earlier.

Quantification of the periodic additions to a reserve necessary to adequately fund a future claim exposure implicates the same type of interest assumption that influences the relationship between premium cost and guaranteed future benefit value in that reserve balances are deemed to earn interest while in the insurer's hands in the same manner as do the premium dollars that it has collected.

Since the reserve requirement is measured by the guaranteed future benefit against which the reserve is to apply, the same rate of interest is used to determine guaranteed future benefit and its correlative reserve. That rate, as fixed by the Texas Standard Valuation Law, was $3\frac{1}{2}$ percent throughout the period in suit. Finding 14, *infra*.

The $3\frac{1}{2}$ percent ceiling on the rate of return that plaintiff could guarantee on its annuity policies left it at a competitive disadvantage with other investment opportunities available in the financial marketplace to both a prospective purchaser of one of its policies and to one who already owned such a policy but had the standard privilege of surrendering it and receiving its then cash value.

Beginning in 1961 plaintiff acted to increase the attractiveness of its annuities to both prospective purchasers and current owners of such policies by crediting policyholders with more interest than the $3\frac{1}{2}$ percent guaranteed in existing coverages and those that it was offering for sale. Consistent with the unambiguous representations made in its claims for refund,[15] plaintiff explains, on brief, its purpose in providing additional interest to policyhold-

---

**15.** Finding 15, *infra*.

ers as follows (Plaintiff's Reply Br. p. 38–39):

> The payment of this additional interest was necessary in order to retain existing pension [funds] and generate additional investment income through sales of new pension contracts.

Plaintiff's initiative did not offend the rate of return limitation of the Texas Standard Valuation Law because the additional interest that it featured was not guaranteed in any of its policies but was subject entirely to plaintiff's discretion.

Plaintiff determined the amount, if any, of additional interest to be awarded an eligible policyholder as of the first anniversary of the policy and annually thereafter until the policy was paid up. Plaintiff's methodology for this yearly determination was uniform but was not disclosed in any of the subject policies or otherwise formally communicated to prospects or policyholders generally. For each eligible policy the approach involved applying to the amount of the current year's net premium, the rate of return that plaintiff realized on investments that it made that year in mortgages, preferred stocks and bonds. Plaintiff calls that rate of return the new money rate. As such, this narrow-guaged measure of return is to be distinguished from a statutory component, known as current earnings rate, of policy and other contract liability requirements mentioned earlier as a determinant of the policyholders' share of investment yield. Section 805(b)(2). Broader in scope, plaintiff's current earnings rate [16] reflects the annual return that it realizes on its entire investment portfolio. That portfolio includes, of course, the selected investments utilized by plaintiff to compile its new money rate. In any event, for each

of the years in suit plaintiff's new money rate, not specified in the record, exceeded the 3½ percent mandated by the State of Texas, the dollars representing such excess ranging from almost three-quarters of a million to more than one million dollars. Findings 16, 18, *infra.* It is those amounts that plaintiff credited to its eligible policyholders and for which it now seeks a deduction under section 804(c)(1) as investment expenses, that being one of the enumerated deductions from gross investment income that is authorized in arriving at investment yield—a quantity that once determined is then apportioned in part to policyholders with only the remainder being taxable to the insurer.

For the earlier years involved in *Southwestern I, supra,* plaintiff sought unsuccessfully to utilize the same type of additional interest confronted here as a means of decreasing its taxable share of investment yield, contending that such amounts were "interest paid" within the meaning of that term as found in subsection (a)(3) of section 805, the provision defining policy and other contract liability requirements.

The court properly rejected plaintiff's claim, noting that the portion of section 805(e) [17] under which it claimed to fit restricted "interest paid" to interest paid in respect to insurance contracts, unlike plaintiff's, that do not involve life, health or accident contingencies. 560 F.2d at 639. Additionally, the court pointed out that since plaintiff earned far more on its policy reserves than the 3½ percent prescribed by state law and was permitted to recognize [18] those actual earnings in calculating its policy and other contract liability requirements [19] for purposes of apportioning in-

---

**16.** For the years in suit, plaintiff's current earnings rate ranged approximately from 4.26 percent to 5.39 percent. Finding 22, *infra.*

**17.** Section 805(e).

(2) *Amounts in the nature of interest.*—All amounts in the nature of interest, whether or not guaranteed, for the taxable year on insurance or annuity contracts (including contracts supplementary thereto) which do not involve, at the time of accrual, life, health or accident contingencies.

**18.** By way of the current earnings rate. Section 805(b)(2).

**19.** It is an incontrovertible given that the larger the amount of policy and other contract liability requirements, the larger the policyholders' share of investment yield and the smaller the portion taxable to the insurer. Section 804(a)(1).

vestment yield, it was already receiving a substantial tax benefit in respect to the additional interest that it was awarding policyholders. 560 F.2d at 639. Thus, had plaintiff prevailed, it would in effect have been including the same interest twice in its policy and other contract liability requirements.

■ Plaintiff fares no better in attempting to constitute its additional interest payments as "investment expenses" under section 804(c)(1) than it did in targeting them on the "interest paid" provisions of section 805(e).

Without definition or amplification, section 804(c)(1) simply authorizes a deduction for investment expenses for the taxable year among various other items [20] to be subtracted from gross investment income in order to arrive at investment yield. The associated Treasury Regulation, § 1.804–4(b), adds little real illumination, saying: "[i]nvestment expenses' are those expenses of the taxable year which are fairly chargeable against gross investment income."

Neither party has identified, nor has research disclosed, any legislative history fleshing out the bare bones of the statutory language.

Under the circumstances described, adherence to precedent remains as the sensible guide to resolution of the question presented.

Before applying precedent, it is essential to note that no controversy exists as to the purpose of the additional interest payments in question. That purpose, as consistently announced by plaintiff in its refund claims and on brief, was to increase the desirability of its annuity policies in order both to stimulate sales of such policies and to retain such contracts as it already had on its books. Accordingly, the connection with investments was simply that of providing wherewithal by attracting new funds and retaining those funds already on hand. Precedent uniformly holds that such a connection is too indirect to support an "investment expense" deduction for the interest expenditures involved.

In *Union Central Life Ins. Co. v. Commissioner*, 720 F.2d 420, 423 (6th Cir.1983), the court held, in reversing the Tax Court, that a state franchise tax levied in part on gross premiums did not qualify for deduction under section 804(c)(1) because it was not directly related to the production of investment income. The court drew support for this result from *New World Life Ins. Co. v. United States*, 26 F.Supp. 444, 458, 88 Ct.Cl. 405 (1939).

Framing the question as whether the loan service work of certain insurance agents generated investment income, the court in *Liberty Life Ins. Co. v. United States*, 594 F.2d 21, 25 (4th Cir.1979), approved a deduction under section 804(c)(1) for that portion (and only that portion) of agents' commissions that the court below had allocated to the servicing of policy loans.

Acknowledging the superficial merit of the taxpayer's claim that it was entitled to an investment expense deduction for interest that it paid on money borrowed for investment purposes, the court nonetheless denied the deduction in *Service Life Ins. Co. v. United States*, 293 F.2d 72 (8th Cir.1961).

As in *Southwestern I, supra*, there is an additional reason for denying the deduction sought here. It proceeds from a recognition that the interest for which an investment expense deduction is sought (to reduce investment yield) is included in the revenue base underlying plaintiff's current earnings rate. By virtue of section 804(a)(2) the greater that rate (all else being equal), the greater plaintiff's policy and other contract liability requirements and, in turn, the greater the policyholder's share of investment yield. The greater that share, of course, the smaller the share taxable to plaintiff.

---

**20.** The remaining categories of deductions afforded by subsection (c) are real estate expenses, depreciation, depletion, and a catch-all of trade or business deductions allocable to any trade or business carried on by the insurer other than the insurance business.

With the additional interest having already served to diminish plaintiff's taxable share of investment yield by reason of its inclusion in the numerator of the statutory fraction determining that share [21], to then use the same interest (as an investment expense deduction) to reduce the investment yield, the fraction's denominator, would confer on plaintiff an illogical and duplicative benefit that should be sanctioned only on a compelling showing of justification. Plaintiff has made no such showing. Accordingly, in keeping with the weight of the precedents, it is concluded that the payments of additional interest, in the circumstances presented, are not deductible as investment expenses under section 804(c)(1).

### Deferred Premiums

This issue presents another aspect of the composition of policy and other contract liability requirements prescribed by section 805(a) to be used as the numerator in the ratio set forth in section 804(a)(1) to determine the policyholders' share of investment yield, i.e., the share of that yield on which the insurer is not to be taxed. As previously noted,[22] section 805(a) defines policy and other contract liability requirements as the sum of three elements, the second of which is a variant of life insurance reserves. Section 805(c)(1) directs that life insurance reserves are to be as defined in section 801(b) and that section provides, in part, that such reserves "... must be required by law."

The question here is whether plaintiff was entitled to include deferred premiums in the reserve balances that it used to determine its policy and other liability requirements. It did so, thereby decreasing its taxable portion of investment yield and defendant contests that action.

The point of departure in examining this question must be the Supreme Court's decision in *Commissioner v. Standard Life & Accident Ins. Co.*, 433 U.S. 148, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977), in which it

held, under a stated assumption, that deferred premiums were to be included in life insurance reserves. The Court began its consideration of the question saying, 433 U.S. at 157, 97 S.Ct. at 2528:

We start from the premise that unpaid premiums must be included in a life insurance company's reserves.

Taken in conjunction with the statutory definition of life insurance reserves as including only those reserves required by law, that foundation assumption preordained the conclusion that followed.

Despite a welter of documentation and verbiage from the parties, the factual aspects of the present controversy are not in dispute.

In accordance with standard industry practice, and as required by Texas law [23], plaintiff calculates its reserves as of December 31 of each year. It does so employing the so-called mean reserve procedure. For reasons of computational convenience, that procedure employs two fictional assumptions viz., (1) that the issuance dates of all policies for which the reserve is being computed are spread evenly over the year, resulting in a July 1 anniversary date for the policy group as a whole, and (2) that the full annual premium is paid at the issuance date and on each anniversary thereafter. Finding 32, *infra*. Contrary to that assumed pattern of premium payment, the vast majority of plaintiff's policyholders paid their premiums only quarterly or monthly, as they were fully authorized to do by their policies. Nonetheless, it is that conventional practice by plaintiff's policyholders that creates the deferred premiums (amounts not yet paid because not due but assumed to have been paid), whose inclusion in reserves is challenged here. Finding 33, *infra*.

Whatever the state of the record in *Standard Life, supra*, or the nature of apparently unfounded and therefore gratuitous concessions made at argument on behalf of

---

**21.** Section 804(a)(1).

**22.** p. 108, *supra*.

**23.** Finding 29, *infra*.

the Commissioner [24], plaintiff does not dispute that neither the insurance laws of Texas [25] nor the state authorities who administered these laws *required* the inclusion of deferred premiums in life insurance reserves. Findings 27, 35, *infra*. It is equally clear that the Texas regulators *permitted* plaintiff to overstate its reserves by including deferred premiums, *provided* that it fully offset the extent of that overstatement by a compensating entry on the asset side of its balance sheet so that surplus was unaffected. Finding 35, *infra*.

Accordingly, the ultimate question for resolution here is whether a reserve that is not required by applicable state statutory law but is permitted by the state authorities administering that law qualifies as a "reserve required by law" within the meaning of section 801(b).

▬ Long ago it was said that the words "require" and "permit" express different ideas; in the ordinary use of the English language, the one does not include the other. *In re Boyd*, 213 Fed. 774, 775–76 (2nd Cir.1914). Presumably, Congress knew the difference between these words when it crafted section 801(b). For that reason and because a deferred premium occupies no part of the reserve that Texas Law [26] required plaintiff to maintain it is concluded that plaintiff's deferred premiums were not within the ambit of the reserves required of it by law within the meaning of section 801(b).

Since the present record does not disclose the tax liabilities represented by this deferred premiums issue, the parties are directed to file with the clerk an agreed statement of such amounts within 90 days of this opinion.

**24.** 433 U.S. at 157 n. 18, 97 S.Ct. at 2529 n. 18.

**25.** Finding 27, *infra*.

**26.** The Standard Valuation Law, adopted by Texas as the measure of the reserves *required* by that State to be maintained by its insurers (while at the same time *permitting* those insurers to maintain larger reserves should they so desire), defines an insurance reserve as no more nor less than the excess, at reserve valuation date, of the present value of future guaranteed

## Finding of Fact

1. Plaintiff, a Texas corporation with headquarters in Dallas, and since 1981 a subsidiary of Tenneco, Inc., is a stock life insurance company that issues multiple lines of coverages including individual and group life, accident and health, and various forms of annuities.

2. For the years 1966 through 1971, after plaintiff had timely filed its income tax returns and duly paid liabilities reflected thereon, the Internal Revenue Service, after audit, asserted various deficiencies totalling $4,145,735 in tax and $2,625,742 in assessed interest. After paying those deficiencies plaintiff filed claims for refund of taxes totalling $2,179,141 plus associated assessed interest of $1,333,302. After formal and total disallowance of those claims, the instant suit followed.

3. During the years in suit plaintiff made mortgage loans to individuals, both directly and through third-party mortgage correspondents. Only the loans made directly are involved in this proceeding.

4. Plaintiff's mortgage agreements (some called mortgage and others deed of trust) committed the mortgagors to monthly payments including not only debt curtailment but a *pro rata* share of certain projected annual expenses appurtenant to the mortgaged property. Such expenses related to insurance, property tax and other assessments to which the indentured property was subject. Those additional amounts are described in this proceeding as mortgage escrow funds. The mortgage agreements were not uniform in their characterization of the capacity in which plaintiff was to hold the mortgage escrow funds. The parties have stipulated that

benefits over the present value, at the same date, of all premiums that must be paid in the future to entitle the insured to those benefits. Finding 27, *infra*. Since, by definition, a deferred premium is one that has not been paid (because not yet due) but is treated by the insurer as though it had, it does not enter into the computation specified by the Texas Valuation Law for the determination of a reserve. See Finding 34, *infra*.

some provided that the funds were to be held "in trust" while others assigned no particular status to the funds while in plaintiff's hands. Where the "in trust" language appeared in mortgage agreements it typically did so in the following terms: "... such sums [referring to the mortgage escrow funds] to be held by the holder of the note in trust to pay said ground rents, premiums, taxes, and special assessments, before the same become delinquent." Such agreements imposed no requirements regarding custody of the funds. As custodian, plaintiff was therefore not required to (1) segregate the funds from its general receipts, much less to pay the charges levied against or in respect to a given mortgagor's property with the particular escrow monies collected from that mortgagor, (2) invest the funds, (3) pay interest on the funds, or (4) refund to the mortgagors any amounts that proved to exceed the items of expense for which the funds were collected. Moreover, plaintiff has adduced no evidence showing that any mortgagor intended to create a trust for the periodic receipt of the mortgage escrow funds required by the loan and security indentures.

Finally, the parties have stipulated that the security agreements involved in this suit are generally the same in content as those in the earlier case of *Southwestern Life Ins. Co. v. United States*, 560 F.2d 627 (5th Cir.1977), and, more importantly, that the majority of the instruments now before the court formed a part of the record in the earlier case.

5. Plaintiff maintained ledger accounts for its mortgage lending activities. When it made a direct loan it credited its cash account and debited mortgages receivable.

6. On receiving the mortgagor's monthly payment check, which typically included principal, interest and escrow payment, plaintiff debited cash and credited mortgages receivable, interest income and the escrow payable account.

7. Plaintiff uniformly deposited the monthly mortgage payment checks in its general account at the First National Bank in Dallas (FNB) at Dallas, Texas. This was a non-interest bearing checking account that served as plaintiff's general depository for all business receipts and as the source of payment of all of its business expenses as well as all of its investments. From the standpoint of the bank, as opposed to plaintiff's internal record keeping, there was no segregation or separate identification of the deposit items relating to plaintiff's mortgage lending activities. While the bank did not treat the balance of funds in this account as a compensation balance for plaintiff's borrowing purposes, it did maintain a right, albeit never exercised, to collect obligations owed it by plaintiff out of this account.

8. In 52 of the 60 months comprising the period in suit the balance of plaintiff's escrow account payable exceeded the highest daily balance of funds in its account at the FNB, the account from which all of plaintiff's escrow-type disbursements were made. Moreover, for each of the months May through October 1970, and January through September 1971, the balance of plaintiff's escrow account payable exceeded the sum of its cash, per plaintiff's books, in all bank accounts maintained by it. The record does not include evidence of actual balances in plaintiff's bank accounts other than its general account at the First National Bank in Dallas.

9. Typically there is an interval of time between the issuance of a check and its presentment, after negotiation by the payee, for payment at the bank on which the check is drawn. Under normal business practice the payor credits its cash account on its books when it issues a check. Accordingly, the interval previously described, the payor's actual account balance at its bank will be greater than the cash balance shown on its books. That difference is colloquially known as "float." In this proceeding plaintiff has failed to adduce documentary proof specifically quantifying the float incident to its general account at the FNB or any other of the bank accounts maintained by it during the period in suit. Mr. David O. Epps, plaintiff's Vice

President in charge of audit and tax, was the only witness called by plaintiff who addressed the escrow fund issue in this case. He testified that he had made no effort to determine the amount of plaintiff's float during the period in suit.

10. Out of its general account at the FNB plaintiff paid all insurance premiums, taxes and other assessments as those items became due on the properties in its mortgage loan portfolio. It recorded such payments on its books by crediting cash and debiting the mortgage escrow payable account. The payable account was reduced only to reflect such payments and not otherwise.

11. Because a mortgagor's escrow payments were based on an estimate of future billings for insurance, taxes and other assessments, the payments seldom equalled the ultimate charges for those items. To the extent that the payments exceeded plaintiff's actual disbursements for the charges involved the mortgagor received, at plaintiff's option, either a refund of the excess or a credit against future monthly payments. Where the payments failed to cover the actual charges, plaintiff billed the mortgagor for the difference. Where excessive or deficient payments occurred, interest was neither paid nor charged by the plaintiff. Plaintiff annually furnished each mortgagor with a statement showing all activity in that borrower's escrow account.

12. The opinion in *Monumental Life Ins. Co. v. United States*, Ct.Cl. No. 71–73, filed November 19, 1976, included the following findings of fact dealing with the mortgage escrow funds there involved:

33. During all years pertinent to this case plaintiff and its mortgage correspondents collected amounts from various mortgagors and held the same for payment of taxes, insurance, ground rents, etc., on behalf of the mortgagors. In some instances these funds were held as replacement reserves under certain Federal Housing Authority section 608 mortgage loans.

34. In preparing the "Assets" page of the balance sheet and Exhibit 13 of the N.A.I.C. Annual Statement for each of the years 1957 through 1966, inclusive, plaintiff set forth in indented form the total amount in its custodial accounts representing escrow funds and U.S. Treasury Bonds held for the account of various mortgagors, offset "within the line" by corresponding amounts of liability for taxes, insurance, ground rents, etc., and showed the resulting amount of $–0– in the "Assets" columns of such documents. The amounts of such custodial accounts so excluded were as following for the years shown below:

| Years Ended | Amount |
| --- | --- |
| 12/31/53 | $ 843,813.41 |
| 12/31/54 | 971,774.90 |
| 12/31/55 | 1,132,145.33 |
| 12/31/56 | 1,267,360.49 |
| 12/31/57 | 1,396,790.65 |
| 12/31/58 | 1,552,986.60 |
| 12/31/59 | 1,582,114.68 |
| 12/31/60 | 1,762,991.98 |
| 12/31/61 | 1,803,199.98 |
| 12/31/62 | 1,882,035.59 |
| 12/31/63 | 1,963,011.42 |
| 12/31/64 | 1,863,543.37 |
| 12/31/65 | 1,910,190.00 |
| 12/31/66 | 1,728,651.84 |

35. In its computation of the Phase I federal income tax for the years 1958 through 1966, inclusive, plaintiff excluded from its "Assets" the amounts of custodial accounts or escrow funds and U.S. Treasury Bonds held for the accounts for various mortgagors in the amounts set forth in Finding 34, above.

36. The U.S. Treasury Bonds referred to in paragraphs 34 and 35 represented investment of a portion of the replacement reserves held for the FHA section 608 mortgages and although such bonds were bearer bonds with coupons attached, a separate record of specific bonds held for specific mortgagors was maintained by plaintiff and the interest on the bonds was paid or credited to the mortgagors when received.

37. The escrow funds referred to in Findings 33, 34 and 35, *supra*, were held as bank deposits as follows:

(a) In connection with such funds held for mortgages serviced by plaintiff's mortgage correspondents, which are located in various cities, the funds were held in separate custodial bank accounts of the mortgage correspondents with the typical title of such accounts being "XYZ Mortgage Company, Agent for Monumental Life Insurance Company, Custodial Accounts."

(b) In connection with such funds held for mortgages serviced directly by plaintiff, the funds were held in separate bank checking accounts of plaintiff entitled "Monumental Life Insurance Company, Custodial Account." In each of the banks in which plaintiff deposited escrow funds it also maintained substantial deposits of its own funds in checking accounts. Plaintiff received no tangible, indentifiable commercial consideration from any of the banks in return for depositing the escrow funds.

38. With respect to escrow funds held for mortgages which the plaintiff serviced, withdrawals were made from the separate custodial bank accounts maintained for such funds only to pay taxes, insurance, ground rents, etc. as such became due.

39. In computing deficiencies in federal income tax asserted for the years 1958 through 1966 the Commissioner of Internal Revenue included in plaintiff's "Assets," for purposes of the Phase I Treasury Bonds held for the accounts of various mortgagors, referred to in Findings 33–38, *supra*. Those funds and any income therefrom, constituted property belonging to others held by plaintiff and its correspondents only in a fiduciary capacity. Accordingly, such funds were not available to plaintiff for its own investment purposes and it otherwise de-

rived no tangible economic benefit by reason of their existence.

13. During the years in suit plaintiff sold pension trust annuity contracts, group annuity contracts, pension trust life contracts and group permanent life contracts to implement various pension, profit sharing and annuity plans that were qualified under section 401, of the Internal Revenue Code. Four standard form contracts were offered under the pension plans, which were grouped into two basic classifications *viz* annuity contracts and life contracts. Plaintiff maintains life insurance reserves under each of these two types of policies.

14. Among the stipulations in the life and annuity contracts in suit was one that permitted plaintiff, in its sole discretion, to credit a policyholder-participant with a greater amount of interest than that assumed in the computation of the reserve relating to the participant's contract. The maximum permissible assumed rate, as fixed by the Texas Standard Valuation Law, was 3½ percent throughout the period in suit. In turn, this was the rate guaranteed purchasers of plaintiff's annuity policies during the same period.

15. In an effort begun in 1961 to be competitive with investment opportunities available in the financial marketplace to both prospective buyers and holders of the group life and annuity policies, typically containing redemption privileges, that it had previously sold, plaintiff instituted a practice of crediting policyholders with more interest than that guaranteed by both the policies that were in force and those that it was offering for sale. The purpose of this program was two-fold; to discourage existing policyholders from surrendering their policies for cash value and to generate new business in the same types of policies.* Given this two-fold objective, it is clear that such additional interest as was involved had only an indirect, rather than a

---

* In its claims for refund, on the disallowance of which the present suit was brought, plaintiff defined its overall purposes for allowing its policyholders additional interest as follows:

Southwestern agrees to pay the additional contractual interest in order to generate addi-

tional premium income which in turn produces gross investment income and to be competitive with other institutions, like banks which compete for pension funds.

direct connection with the production of investment income for plaintiff. Accordingly, beyond the fact that, the more active policies that plaintiff had on its books the greater its premium collections and, all other things being equal, the greater its income from investment of those premiums, the additional interest had no connection with any particular source or amount of investment income realized by plaintiff.

The amount, if any, of additional interest was determined once each year of the life of an eligible policy after its first anniversary and until it became fully paid up. Plaintiff in fact determined the amount of such additional interest in the manner hereafter described, although none of its policies or other communications to policyholders disclosed this methodology.

For each of the eligible policies in force more than one year plaintiff took account of the amount paid into the policy for the year in which the computation was to be made. For each such year plaintiff calculated the rate of return that it realized on investments that it made during that year in mortgages, preferred stocks and bonds, out of funds deemed attributable to premium receipts from the relevant policies. Throughout the period in suit that rate, called by plaintiff and herein the new money rate, was invariably higher than the 3½ percent rate guaranteed the policyholders and assumed for purposed of computing the reserve maintained for each of the policies in force. After deducting the 3½ percent rate from the new money rate, the difference was applied to the current mean reserve of the underlying policies. From the resulting figure, representing so-called additional interest, plaintiff deducted a nominal service charge and credited the policyholder with the remainder. Typically, the amount of the credit was applied to reduce future premiums payable under the policy. In rare instances, however, where the policyholder specifically requested payment of the credit in cash, that was done.

Plaintiff was under no contractual obligation to its policyholders to award them any interest in excess of the 3½ percent

guaranteed by their policies and such awards were totally uninfluenced by mortality considerations or by plaintiff's overall profitability, its total net investment income, its net underwriting income, its operating expenses or its balance of surplus.

16. During the years in suit plaintiff credited additional interest to the holders of eligible policies as follows:

| Year | Annuity Contracts | Life Contracts | Total |
|------|------------------|----------------|-------|
| 1966 | $  468,556.01 | $ 366,603.78 | $  835,159.79 |
| 1967 | 520,099.23 | 403,603.43 | 923,694.66 |
| 1968 | 459,128.29 | 374,384.78 | 833,513.27 |
| 1969 | 614,828.27 | 438,066.15 | 1,053,794.42 |
| 1970 | 530,694.44 | 210,055.44 | 740,749.88 |
| 1971 | 635,791.04 | 293,761.46 | 929,552.50 |

17. Gross premium receipts from the policies reflected in the preceding finding were as follows:

| Year | Annuity Contracts | Life Contracts | Total |
|------|------------------|----------------|-------|
| 1966 | $ 8,659,568.15 | $4,753,439.41 | $13,413,007.56 |
| 1967 | 10,347,165.10 | 5,210,654.60 | 15,557,819.70 |
| 1968 | 12,367,435.98 | 6,198,102.89 | 18,565,538.87 |
| 1969 | 13,352,199.25 | 5,020,771.43 | 18,372,890.68 |
| 1970 | 16,285,168.09 | 6,595,178.29 | 22,880,346.38 |
| 1971 | 14,194,462.93 | 7,450,458.76 | 21,644,921.69 |

18. The plaintiff has not specified, and the record does not reflect the so-called new money rate that plaintiff realized on its selected investments during the period in suit. While the precise rates achieved are therefore unknown, the fact that additional interest was realized in each such year (the amount representing the disputed deduction sought by plaintiff) demonstrates that the new money rate was invariably higher than the 3½ percent rate that was guaranteed and assumed for purposes of calculating the underlying reserves.

19. The additional interest shown in finding 16, *supra*, representing plaintiff's return on selected mortgages, preferred stocks and bonds, was reported by plaintiff as a part of its gross investment income on its tax returns for the years in suit, as required by section 804(b)(1) of the Internal Revenue Code. In turn, that income became a part of plaintiff's investment yield by virtue of section 804(c) of the Code.

20. It is undisputed herein that in accordance with Section 804(a)(1) of the Code plaintiff was not taxed on its policyholders' share of the investment yield realized by it. That share, the statute directs, is determined by dividing an amount representing policy and other contract liability requirements by investment yield. It follows that the larger the numerator of that fraction, the larger the policyholders' share of investment yield—the portion of yield not taxed to plaintiff.

21. The figure representing policy and other contract liability requirements is the sum of three ingredients, one of which is "the mean of the pension plan reserves at the beginning and end of the taxable year, multiplied by the current earnings rate." Code Section 805(a)(2). In turn, the current earnings rate is determined by dividing the taxpayer's investment yield for the taxable year by the mean of its assets at the beginning and end of that year. Code Section 805(b)(2).

22. According to its tax returns, plaintiff's current earnings rate for each of the several years in suit was as follows:

| Year | Current Earnings Rate |
|------|----------------------|
| 1966 | 4.26486% |
| 1967 | 4.70846% |
| 1968 | 4.84327% |
| 1969 | 5.11903% |
| 1970 | 5.26522% |
| 1971 | 5.39340% |

23. Since all of plaintiff's earnings from its new money rate investments in mortgages, preferred stocks and bonds were included in its investment yield, finding 19, *supra,* and since that yield is one of the two determinants of its current earnings rate, finding 21, which in turn is one of the determinants of its policy and other contract liability requirements, finding 21, *supra,* it follows that all of such earnings, including the portion of them representing a return in excess of 3½ percent, served to decrease plaintiff's tax liability by increasing its policy and other contract liabilities and correspondingly increasing the policyholders' share of investment yield. Finding 20, *supra.*

24. During the period in suit plaintiff had outstanding approximately 100,000 annuity contracts of the type described in finding 13, *supra.* These contracts (hereafter called deferred annuities) stipulated annual premiums that could be paid monthly, quarterly or annually. In fact, premiums were paid annually on only about 15 percent of these policies; the remainder were paid either quarterly or monthly. Moreover, March 1 was the approximate issue date of the bulk of such policies.

25. Texas law requires the insurer to maintain reserves in respect to the deferred annuity policies referenced in the preceding finding and to do so in an amount equal to at least the minimum prescribed in such law.

26. Plaintiff, as a Texas domiciliary, was subject to the Texas Insurance Law and to the rules and regulations of the Texas Board of Insurance regarding the maintenance and reporting of reserves on its deferred annuities.

27. For the period in suit Texas Law (Art. 328, Standard Valuation Law Sec. 4, Sec. 5 and Sec. 7, respectively, of the Texas Ins.Code) provided in relevant parts:

Sec. 4. * * * The minimum standard for the valuation of all such policies and contracts shall be the commissioners reserve valuation method defined in Section 5 * * *.

* * * * * *

Sec. 5. Reserves according to the commissioners reserve valuation method, * * * shall be the excess, if any, of the present value, at the date of valuation, of such future guaranteed benefits provided for by such policies, over the then present value of any future modified net premiums therefor. * * *

* * * * * *

(b) * * * *

Reserves according to the commissioners reserve valuation method * * * shall be calculated by a method consistent with the principles of the proceeding paragraph * * *.

Sec. 7. * * * *

Reserves for any category of policies, contracts or benefits as established by the State Board of Insurance, * * *, may be calculated, at the option of the company, according to any standards which produce greater aggregate reserves for such category than those calculated according to minimum standards herein provided. * * *

\* \* \* \* \* \*

28. By Texas law plaintiff was required to file an Annual Statement of its financial condition with the Texas Board of Insurance. As is the case among the states generally, the statement was prepared in the form prescribed by the National Association of Insurance Commissioners. *See, e.g., Commissioner v. Standard Life & Accident Ins. Co.,* 433 U.S. 148, 150, 97 S.Ct. 2523, 2525, 53 L.Ed.2d 653 (1977).

29. On each Annual Statement for the years in suit, plaintiff was required to specify, *inter alia,* the aggregate amount of reserves it held as of December 31 (the date of valuation specified in Art. 328, Sec. 5, Texas Ins.Code) in respect of its outstanding deferred annuity coverage.

30. On the above-mentioned Annual Statement plaintiff computed and reported its aggregate reserves for the deferred annuities in suit according to the mean reserve procedure.

31. The mean reserve procedure is used to derive an aggregate reserve for a group of policies as of December 31, where the policies comprising the group have different anniversary dates and where premiums are due and payable in installment periods of less than one year.

32. The mean reserve procedure is based on two underlying assumptions *viz.* (1) that issuance dates of the policies under observation are spread evenly over the year, resulting in a July 1 anniversary date for the group as a whole, and (2) that the full annual premium is paid at date of issuance and on each anniversary thereafter. In the case of the deferred annuities in suit each of these assumptions is contrary to fact. *See* Finding 24, *supra.*

33. Deferred premiums arise where the annual premium for a deferred annuity is payable in installments, typically monthly or quarterly. Deferred premiums are those that become due after the December 31 valuation date but before the next anniversary date of the policy. The evidence in the record conclusively shows both that the plaintiff has no enforceable right to collect any deferred premiums and that, correlatively, plaintiff has no insurance risk or other unfunded liability exposure with respect to the periods of future coverage to which such premiums related.

34. As a result of employing the mean reserve procedure to calculate its reserves for deferred annuities, plaintiff overstated those reserves by the total amount of premiums that were in fact deferred as of the December 31 valuation date. The overstatement occurred because such premiums, although due and payable only in the future (*i.e.,* after December 31), were not recognized as a part of the future premiums that the Standard Valuation Law (Finding 27, *supra*) directs be deducted from future benefits to arrive at the reserve. Since the amount of the deduction for future premiums was understated, the resulting reserve figure was overstated to the extent of the premiums that were in fact deferred as at December 31.

35. Plaintiff's reserves for deferred annuities appear as a liability item on the balance sheet portion of the annual statements that it filed with the Texas insurance regulatory authorities. The paramount interest and concern of those authorities in the balance sheet of a carrier selling coverages in that State is with its solvency, *i.e.,* its financial ability to satisfy the total risk exposure represented by the policies that it has outstanding. Thus, in the balance sheet context the authorities' ultimate concern is with surplus rather than with individual asset or liability items that combine in the aggregate to produce either a deficit or surplus balance. It is for that reason that the Texas authorities accepted plaintiff's annual statements including an overstatement of liabilities in the form of re-

serves reflecting an erroneous treatment of deferred premiums and permitted that overstatement to be neutralized by an off-setting overstatement of assets accomplished by an inclusion of the amount of deferred premiums. Since the effect on surplus of these equivalent overstatements of assets and liabilities was nil and since the regulators had no concern with the implications of those overstatements in contexts other than plaintiff's ability to meet its guaranteed benefit obligations to policyholders, its annual statements were accepted as filed. The evidence shows that those statements would have been equally as acceptable to the Texas regulators if deferred premiums had been totally excluded from both assets and liabilities shown on the balance sheet portion of the statements. Accordingly, the evidence shows that although reserves reflecting an element representing deferred premiums are permitted by Texas Law (Finding 26, *supra*) and by the regulatory practice of that State, they are in no sense required by either of those sources or otherwise.